NIEHOFF-SCHULTZE GROCER COMPANY, Respondent, *v.* ALEXANDER J. GROSS and Another, Copartners, Doing Business as IGNATIUS GROSS COMPANY, Appellants.

First Department, April 6, 1923.

Sales — action to recover back purchase price paid for beans — beans were sold by sample — delay of five months after delivery before notifying seller of alleged breach of warranty bars recovery as matter of law — instructions — error not to charge warranties arising on sale by sample under Personal Property Law, § 97 — sale was by sample where particular sale was repeat order of sale made by sample.

In an action to recover back the purchase price paid for beans on the ground that they did not conform to the sample, the plaintiff's right to recover is barred, as matter of law, where it appears that the beans were bought on a repeat order, were received, inspected and accepted by the plaintiff in May and were retained in a hot warehouse for five months before they were analyzed and pronounced unfit for use and notice given to the defendants of the alleged breach of warranty.

It was error for the court not to charge the warranties which a seller makes on a sale of goods by sample as provided by section 97 of the Personal Property Law.

The sale in question was one by sample, since it was a repeat order for beans and the first order was one made by sample.

APPEAL by the defendants, Alexander J. Gross and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 15th day of December, 1921, upon the verdict of a jury, and also from an order entered in said clerk's office on the 22d day of December, 1921, denying defendants' motion for a new trial made upon the minutes.

*H. & J. J. Lesser* [*Abraham Tulin* of counsel], for the appellants.

*Rockwood & Lark* [*George N. Sage* of counsel; *Nash Rockwood* with him on the brief], for the respondent.

MCAVOY, J.:

The complaint asserts and the proof shows that during the month of April, 1917, S. M. Frank & Co., representing the defendants as broker, offered to sell to the plaintiff for seven cents per pound, to be paid to the defendants by the plaintiff, F. O. B. New York city, 400 bags of beans, which said beans the said S. M. Frank & Co., on behalf of the defendants, represented and warranted to be "imported Roman Pinto beans," each bag to contain 165 pounds of said beans.

On the 19th day of April, 1917, the defendants duly confirmed in writing and accepted the sale made by S. M. Frank & Co. to the plaintiff of 400 bags of imported Roman Pinto beans, of 165 pounds each, at the price of seven cents per pound, F. O. B. New York city, and agreed to ship and deliver to the plaintiff the 400 bags of beans which the defendants warranted to be Roman Pinto beans.

The plaintiff, relying on said warranty and representation, and believing the same to be true, was induced thereby to purchase and did purchase said 400 bags of beans, each bag containing 165 pounds of beans from said defendants, and paid to defendants therefor seven cents per pound, or the sum of $4,620. Said beans were not delivered and did not come into the hands of the plaintiff upon the purchase or when payment therefor was made, but were in the possession of or under the control of the defendants; and the bill of lading, entitling plaintiff to the delivery to it of the said beans, was attached to a sight draft for the sum of $4,620, which said sight draft the plaintiff was obliged to and did pay before having an opportunity of examining the beans.

Before plaintiff paid the draft or the freight upon the shipment of beans, the defendants, by way of inducement to the plaintiff, executed in writing a guaranty to the plaintiff that the articles of foods or drugs manufactured, distributed or sold by them, were not adulterated or misbranded under the United States Food

and Drugs Act, June 30, 1906, and amendments thereto, nor under the food laws of any State of the United States, at the time of sale.

The plaintiff claims that, relying upon this guaranty and also relying upon said warranty and representations, and before the delivery of said beans to the plaintiff, on or about the 30th day of April, 1917, it paid the sight draft amounting to $4,620, which was the purchase price of the beans, and in addition thereto paid the freight charges upon the shipment of the beans, amounting to the sum of $243.54.

An inspection of the beans by the plaintiff, made immediately after the delivery thereof to the plaintiff, showed that the beans were not of the quality or kind warranted and agreed to by the defendants upon the sale; and it is alleged that they were not Roman Pinto beans.

Further plaintiff asserts that the beans did not conform to nor comply with the United States Food and Drug Act of June 30, 1906, and amendments thereto,* but that they were adulterated and misbranded; that the said defendants failed to perform their agreement with the plaintiff; that the beans were of a very inferior kind and quality; that they contained ingredients which made them dangerous foodstuffs and detrimental to the public health; that the beans were unmerchantable and wholly unfit for use and of no value whatever; that plaintiff immediately on ascertaining that the beans were not of the kind or quality warranted and agreed, notified the defendants and caused them to be notified of the character and condition of the beans, and offered to return the same or to hold and dispose of the same as the defendants might elect, but the defendants refused to receive the beans or to return to the plaintiff the price therefor, which plaintiff demanded.

Upon these facts plaintiff claims damage in the sum of $4,863.54.

The answer, after certain denials, alleges as a defense that during the month of April, 1917, the plaintiff and defendants entered into an agreement wherein and whereby and by the terms of which the defendants agreed to sell and deliver to the plaintiff, and the plaintiff agreed to purchase of and from the defendants, 400 bags of beans similar to a sample then and there exhibited and submitted to the plaintiff at seven cents per pound, F. O. B. New York city.

The plaintiff, at the time that the sample beans were exhibited and submitted to it by the defendants, approved of the same. Thereafter, and according to the contract, the defendants duly

---

* See 34 U. S. Stat. at Large, 768, chap. 3915, as amd.— [REP.

delivered to the plaintiff 400 bags of beans in accordance with the sample exhibited to the plaintiff by the defendants and approved of by the plaintiff; and the plaintiff paid the purchase price therefor; that the defendants have duly performed all the terms and conditions of said contract on their part to be performed.

The plaintiff had a verdict for the full amount claimed, with interest. The uncontradicted evidence was that this lot of 400 bags of beans was the second lot of beans of that identical kind and description which the plaintiff had purchased from the defendants within the period of one month; that in March, 1917, one month prior to the purchase of this lot of beans, the plaintiff had purchased a lot of 100 bags from the defendants from samples, paid for them and marketed them without complaint. The 400 bags here involved were exactly the same kind of beans and came out of the same original consignment as the first lot, and were exactly like the sample upon which such first lot had been purchased as well as like the bulk of such first lot.

The defendants say that the only distinction between the two lots of beans were (1) that the first lot was purchased, received and marketed by the plaintiff when the market was rising, while shortly after the delivery of the second lot the market fell alarmingly, and (2) that the first lot was satisfactorily disposed of in the trade shortly after its delivery in the cool months of March and April, while the second lot was kept unfumigated in a hot warehouse in St. Louis from May 3 to October 15, 1917, the five hot months, and allowed to deteriorate.

The proof shows that it is a case of goods bought on a repeat order, received, inspected and accepted by the buyer on May 3, 1917, retained for five months in a hot warehouse until probably spoiled, and then analyzed and pronounced unfit for use.

Upon the arrival of the beans, plaintiff's president, Mr. Niehoff, who testified that he was the buyer for plaintiff of certain lines of merchandise and had been buying different varieties of beans for plaintiff since 1916, personally examined the beans " to see what kind of beans they were," and then had them put in his company's stock, in warehouse, where they were kept and dealt with like the rest of the plaintiff's merchandise.

He had personally within a month theretofore also examined the sample on which the first lot of 100 bags had been sold him, as well as the bulk of such 100 bags which his company had received and disposed of in the trade. These 400 bags of beans were exactly like the sample upon which the plaintiff had purchased the first lot of 100 bags, and like the bulk of such first lot of 100 bags, as plaintiff's president admitted upon cross-examination.

They came out of the same original importation of 2,000 bags which the defendants made in February, 1917.

The plaintiff's correspondence illumines the situation more fully than paraphrasing could.

The first letter received read:
                                             " *July* 3, 1917.
" IGNATIUS GROSS CO.,
          " 268-269 West St., New York, N. Y.:
" GENTLEMEN.— Under date of April 26th, we purchased some Roman Pinto Beans from you.  We find that these beans are not adapted for our trade and are writing to see if you could use these beans.  If so, kindly make us an offer, and oblige,
                    " Very truly yours,
               " NIEHOFF-SCHULTZE GROCER CO."

Thereafter, plaintiff wrote again:
                                             " *July* 11, 1917.
" IGNATIUS GROSS CO.,
          " 268-269 West Street, New York City, N. Y.:
" GENTLEMEN.— Referring to the Roman Pinto Beans purchased of you, we feel as though these beans are not pure food, as we are having numerous complaints of these beans cooking very bitter and consequently are having all these goods returned to us wherever sold.  As we are holding your pure food guarantee on this purchase, we ask that you release us of these beans.  Of course, we have made no analysis of these beans as yet, however, unless we hear from you promptly we shall see ourselves forced to have the Pure Food Inspector make analysis.

" We trust you will give this matter your early attention.
                    " Very truly yours,
               " NIEHOFF-SCHULTZE GRO. CO."

Plaintiff on July 16, 1917, again wrote the defendants, claiming under the guaranty and saying:

" We feel that these beans are not Pure Food.  Consequently, are giving you one more opportunity to relieve us of same.  Your early reply will be appreciated."

The testimony on the subject of the actual condition and quality of the beans, even in October, 1917, after they had lain unfumigated for more than five months in a hot warehouse — there is no testimony as to their condition in April or May, when bought and delivered — is so vague and inconclusive as to violate elementary rules of evidence requiring reasonable certainty and directness of proof.  Such testimony should never have been admitted.

Thomas A. Buckland testified by deposition that he had charge of the office and laboratory of the city chemist of St. Louis, and

that " On October 18, 1917, samples of Rangoon beans, one from Niehoff-Schulze Grocer Company, 714 Spruce Street, St. Louis, the other from Tyler warehouse, O'Fallen Street, near Broadway, was received from Assistant Chief Sanitary Officer W. R. Cook. These samples were submitted to chemical analysis with the result that B63 from Niehoff-Schulze Grocer Company, was found to contain 38.5 milligrams of hydrocyanic (prussic) acid in 100 grams of beans; and sample B64 from the Tyler Warehouse, was found to contain 37.7 milligrams of hydrocyanic (prussic) acid in 100 grams of beans."

The defendants' expert testified as follows: " Q. Will you please explain to the court and jury what happens to a bean, if allowed to remain in one place for a period of about six months?   A. All beans are subject to deterioration.  In the winter time they hold very well and do not deteriorate, on account of the cold, but when it gets on towards the summer they lose their color and they deteriorate in quality.  That is one of the reasons why possibly 95 per cent. of all the beans consumed in the United States and other countries are consumed in the winter time.  In the summer time there is very small trade in beans.  Q. Please state to the Court and jury when they begin to deteriorate?  A. All crops are harvested within the months of October, September or October. That is the time when they are harvested, and when it gets on towards the summer of the next year, they lose their color.  They deteriorate and get hard, and anything that is in the bean starts to develop, or it deteriorates, in other words.  Beans, as a rule, especially foreign beans, need fumigation in the summer to keep them in good condition.  That is done in the summer time by different houses.  They take their beans and send them to fumigation houses.  Q. How often do they require to be fumigated? A. Almost every second month they need to be fumigated, to obviate the increase of the bacteria or dust that collects on the outside of the bean, as well as the inherent bug that there is in some beans, a seed bug which, in the winter time, is not found, or cannot be detected in the bean; but when it gets on toward the summer, this insect or bug in question, in a few of the California varieties, begins to develop, and it is fumigated.  Q. If the beans are not fumigated in the summer time, at least every two months, particularly in a warm climate, what is the result?  A. The result is that whatever kind of bacteria or insect life that is inside the bean will increase on account of the heat and will in time ruin the bean and make it unfit for use.  Q. So that when these beans remain in a warehouse for a period of six months, without any fumigation, at least two or three times, would the result you have

testified to appear? A. It would, in all imported beans and in some varieties of California beans. By a Juror: Q. Why do beans become bitter on boiling or cooking? A. Well, there are some varieties of imported beans that have certain acids in them. There are some California varieties that have acids in them. If the percentage is very small you cannot taste it in boiling. You would never know the difference. But if they are allowed to deteriorate by heat, they become worse, and in cooking they will taste bitter."

And the same expert stated as to the nature of the Roman Pinto bean: " Q. Will you please explain what a Roman Pinto bean is? A. The Roman Pinto bean is a variety of bean which originated in Italy. It gets its name from the outskirts of Rome, where the seed was first promulgated. From there on it was shipped to various countries of the world, where they always planted this similar type of seed. The characteristics of the seed are, a pinkish brown with an occasional stripe or spot — that is a characteristic of the bean, the bean is grown in South America, is grown in Austria-Hungary, in Rango, India, and in California."

Mr. Gross further testified positively that the beans in Exhibit No. 5, the sample on which plaintiff purchased the first lot of 100 bags, as well as in Exhibit No. 6, the sample taken from the second lot of 400 bags, were Roman Pinto · beans, which came from Rango, India. It seems the rule that, since the 400 bags of beans were accepted by plaintiff and retained for upwards of five months before notice of the alleged breach of warranty was given the defendants, plaintiff is barred from recovering in this action as a matter of law.

The 400 bags of beans were accepted by the plaintiff on May 3, 1917, after an inspection and examination as to what kind of beans they were by plaintiff's president, who then had the beans put in stock in plaintiff's warehouse, whence they were shipped out to plaintiff's customers in the ordinary course of trade. For two months thereafter plaintiff retained the beans and remained quiet, although it wrote in its letter of July 11, 1917, that " We are having numerous complaints of these beans cooking very bitter and consequently are having all these goods returned to us wherever sold." Despite these complaints and returns, plaintiff's first suggestion to the defendants on July 3, 1917, was that the defendants should " kindly make us an offer " to repurchase the beans, if they could use them. This was not a rejection of the beans, nor notice of any breach of warranty. When defendants declined to make such an offer, plaintiff wrote on July eleventh, asking the defendants to relieve them of the beans, otherwise plaintiff would have the pure food inspector make an analysis of

them. This again was neither a rejection, nor notice of breach of warranty. In fact there was no definite rejection of the beans, if ever, until the 6th of October, 1917, when plaintiff requested the defendants to take up its draft for the purchase price of the beans. In other words, the plaintiff retained the beans for two months after their receipt and inspection without saying a word, then for three months longer before actually tendering them back, and for a total period of more than five months (from May 3, 1917, until October 18, 1917) before having the beans analyzed, although it had knowledge, certainly as early as July 11, 1917, that the beans were cooking bitter and were being returned to it by its customers. Under these circumstances, the plaintiff must be held as a matter of law (1) to have accepted the beans, and (2) to have failed to give notice within a reasonable time of any breach of warranty; and must be held, consequently, to be barred from recovering in this action.

The case of *Ferguson* v. *Netter* (204 N. Y. 505) is in point. In that case the defendant retained the goods, which were mushrooms packed in sealed tin cans, for seventy days after receipt before finally deciding to reject the goods, although he complained to the seller of their quality by numerous letters during such seventy days, claiming that the mushrooms were being returned to him as unfit for use. The Court of Appeals, speaking by Werner, J., after reviewing the events as above summarized, held that: " Even if it were possible to regard his [defendant's] final decision as a rejection of the goods, we should be under the necessity of holding as a matter of law that it had been unreasonably delayed."

I think there was error in admitting the testimony of both Buckland and Starkloff, after the lapse of nearly six months between the time of the delivery of the beans and the analysis as to which they testified, during which period of nearly six months the beans lay in a hot warehouse without a single fumigation. It is the settled law of this as well as of most other American jurisdictions that a prior condition cannot be proved by evidence of a subsequent one, certainly not when the things involved are food stuffs such as beans, which are obviously perishable and subject to deterioration under varying conditions of temperature, moisture, etc. The pertinent rule of law is pronounced in *MacRae* v. *Chelsea Fibre Mills* (145 App. Div. 588, 591): " The presumption as to the continuance of a condition or state of facts once shown to have existed does not run backwards, and the law never raises from the proof of the existence of a present condition or state of facts, any presumption that the same condition or facts existed at a prior date. (22 Am. & Eng. Ency. of Law [2d ed.], 1239.) "

There is further assignment of error by appellants that this part of the charge of the court was contrary to the rule: " The defendants not only deny these allegations but they set up an affirmative defense, in which they say that the goods were sold by sample; that the plaintiff examined the sample of beans, handled them and that there is no question but what the 400 bags are the same kind of beans as the beans the plaintiff inspected and handled, but that is not enough. The defendants' attorney, in summing up to you, said that the plaintiff got exactly what it bought. It does not follow necessarily that because the plaintiff bought 400 bags of beans on samples that were exhibited to it, that it got exactly what it bought. The question for you to determine is what the plaintiff had in mind to buy; what it considered it was buying; what was represented to it that it was buying. If the plaintiff was not familiar with imported Roman Pinto Beans, it had a right to rely on what they were represented to it to be, and if they were represented by the defendants' agent to be imported Roman Pinto Beans and warranted to be imported Roman Pinto Beans, that is, not misbranded, then the plaintiff was not getting exactly what it bought, and if it did not get exactly what it bought it is entitled to recover the money that it paid for them. As I look at it, it resolves itself into that rather simple proposition."

The above charge was duly excepted to by defendants. If the plaintiff bought the beans on sample, and it is undisputed that the beans delivered were exactly according to sample, then the plaintiff got exactly what it bargained for and was precluded from recovering in this action.

Lord MACNAUGHTEN, in the leading case of *Drummond* v. *Van Ingen* (L. R. 12 A. C. 284, 297), gives forcefully the office of a sample in the sale of goods: " After all, the office of a sample is to present to the eye the real meaning and intention of the parties with regard to the subject-matter of the contract which, owing to the imperfection of language, it may be difficult or impossible to express in words. The sample speaks for itself."

The Sales Act or Sales of Goods Act provides in section 97 of our Personal Property Law (as added by Laws of 1911, chap. 571) that the only warranties which a seller makes in a sale by sample are: (a) That the bulk shall correspond with the sample in quality, (b) that, with a certain exception not here applicable, the buyer shall have a reasonable opportunity of comparing the bulk with the sample, and (c) that the goods shall be free from any defect rendering them unmerchantable, which would not be apparent on reasonable examination of the sample, if the seller is a dealer in goods of that kind. Now, granting that it was a question

for the jury to determine whether or not the sale in the case at bar was a sale by sample (*Henry & Co.* v. *Talcott*, 175 N. Y. 385, 389, 390), it was clearly the duty of the court to charge the jury that if they should find that this was a sale by sample, then the only warranties which the defendant made were those above enumerated. Instead, however, the learned trial court charged as above set forth. This was error which affected the finding.

That the sale in the case at bar actually was a sale by sample, although the sample was exhibited to the plaintiff in connection with the purchase of the first lot of 100 bags and not in connection with the second lot of 400 bags, cannot be doubted. (*Zabriskie* v. *Central Vermont R. R. Co.*, 131 N. Y. 72.) That the label on the sample, reading " Sample of Imp. Roman Beans," did not, under the circumstances of this case, constitute a warranty by the defendants that the beans were anything but what the sample showed, can likewise not be doubted. (*Waeber* v. *Talbot*, 167 N. Y. 48, 55.) In the present case, as in the *Talbot* case, " we have experts in the same business, meeting on an equal footing, the one agreeing to sell and the other to purchase a certain brand of goods."

The conclusion is, for all the reasons above set forth, that the judgment and order appealed from should be reversed, with costs, and the court should exercise its power to dismiss the complaint, with costs, upon the ground that upon the admitted facts plaintiff has no cause of action.

DOWLING, SMITH, MERRELL and FINCH, JJ., concur.

Judgment and order reversed, with costs, and complaint dismissed, with costs.