Robert Gordon Shewan and Others, Appellants, *v.* John C. Sparks, Respondent.

First Department, March 7, 1924.

Sales — action to recover for breach of warranty on sale by sample — sale by sample shown — not necessary to show that sample was exhibited each time installment was ordered — verdict in favor of defendant is against evidence.

In an action to recover damages for breach of a warranty in the sale of dyes, which the plaintiffs alleged were purchased by sample and were not the same as the sample exhibited, the evidence establishes that the sale was by sample as alleged by the plaintiffs and not one by description, and that the goods delivered did not correspond with the sample exhibited, and the verdict in favor of the defendant is against the weight of the evidence.

It is not necessary in order to establish a sale by sample to prove that the sample was exhibited each time an installment of the goods was ordered.

Merrell and Smith, JJ., dissent, with opinion.

Appeal by the plaintiffs, Robert Gordon Shewan and others, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on or about the 15th day of January, 1923, upon the verdict of a jury, and also from an order denying the plaintiffs' motion for a new trial made upon the minutes.

*Lord, Day & Lord* [*Franklin Grady* of counsel], for the appellants.

*George W. Case, Jr.*, for the respondent.

First Department, March, 1924.    [Vol. 208

MARTIN, J.:

The plaintiffs seek to recover damages for a breach of warranty in the sale of merchandise consisting of 2,029 pounds of malachite green crystal dyes purchased from the defendant. The complaint alleges that in September, 1918, the plaintiffs purchased from the defendant the merchandise in question by sample exhibited by defendant, who warranted that the dyes would be in all respects equal to the sample. Plaintiffs assert that after delivery they discovered that the dyes were not as represented by defendant, but were of an inferior quality and practically worthless.

Defendant says that the sale was by description, and not by sample; that the dyes when delivered to plaintiffs in New York were of merchantable quality and equal in every respect to dyes of the same kind purchased by plaintiffs from defendant a month or two before the sale out of which this action arose. The evidence proved beyond question that the goods returned to New York from Kobe were not equal in quality to the sample and were not of a good quality or merchantable.

On the trial plaintiffs established that on the 16th day of May, 1918, they received the following letter:

" Messrs. SHEWAN TOMES & COMPANY,
      " 12 Broadway, New York City:
    " DEAR SIRS.— In regard to your letter #16301 from Kobe, we enclose herewith a sample of Eagle Brand Malachite Green Crystals, on which we can quote you $8.50 per pound *on one thousand pounds* packed in barrels of 500 pounds.

" You will please note that if these crystals have to be packed in tins, the extra cost will be as follows:

Material packed in 25  lb.  tins   $.15 per lb. extra
    "        "       "   10 & 5 lb. "      .20   "   "    "
    "        "       "   1 lb.      "      .25  "   "    "

" We wish to *draw the attention* of your friends in Kobe to the fact that *these are large Crystals, and of extremely good quality*.

" Trusting to receive your *valued order*,
                  " Very truly yours,
                      " JOHN C. SPARKS."

By the terms of this letter it is plainly apparent that the defendant was endeavoring to obtain an order for dyes and submitted a sample in the hope of inducing a sale; not the sale of ten pounds as it is now argued, but the sale of a large quantity of dyes, for the letter says: " we can quote you $8.50 per pound on *one thousand pounds*, packed in barrels of 500 pounds." The sale was afterwards made at eight dollars and fifty cents a pound and upon

the conditions set forth in this letter. The sale of ten pounds referred to herein was also made but at a higher price than here quoted.

Defendant on May 16, 1918, wrote to plaintiffs: " I am sending you herewith by hand the samples of dyes and Malachite Green Crystals as per our letter and as per telephone conversation to-day."

A witness produced by plaintiffs testified that a period of eight or ten weeks is necessary to send a letter to and receive a reply from Kobe, Japan. Parcel post packages require four or five weeks for delivery, and when goods are sent by express it requires about six weeks for them to reach Kobe. It was understood by the defendant that the sample should be sent to Kobe, Japan, for his letter says: " We wish to draw the attention of your friends in Kobe to the fact that these are large Crystals, and of extremely good quality."

That defendant was sending the sample to induce a sale, and was calling attention to the fact that the sample crystals were not only large but were of extremely good quality, cannot now be very seriously controverted.

Orders for the dyes in question were afterwards given as follows: 2,000 pounds on September 4, 1918; 750 pounds on September 20, 1918, and 2,000 pounds on October 8, 1918. Deliveries were made as follows: 35 packages, 245 pounds, on September 27, 1918; 34 packages, 238 pounds, on October 31, 1918; 89 packages, 546 pounds, on November 9, 1918, and 5 barrels, 1,000 pounds, on December 10, 1918, a total of 2,209 pounds. Prompt payments were made by plaintiffs immediately after each delivery, which refutes the assertion that this is an effort to avoid paying for the goods delivered. The remainder of the order *was canceled by consent* in a letter written by defendant to plaintiffs on December 30, 1918.

About the middle of November, shortly after the first shipment, promptly upon receipt of the goods, and after plaintiffs had fully paid for the installment received, plaintiffs' house in Kobe, Japan, notified their New York house, by cable, that the goods were of an inferior quality. The New York house so notified defendant. Defendant on November 14, 1918, wrote to plaintiffs as follows:

" In regard to the cable you have received from Kobe, in connection with the Malachite Green, we presume this is our invoice of September 27th. We have records of the material shipped and still have a sample of that shipment.

" We wish to inform you that the shipment is *highest* quality Malachite Green, and exactly the same as the sample shipped out

to you early in the Spring and the ten pound lot shipped early in August."

It, therefore, appears that the defendant contended that the goods shipped were not only the highest quality of malachite green, but were exactly the same as the sample shipped early in the spring. It is not necessary in order to establish a sale by sample to prove that the sample was exhibited each time an installment was ordered.

We are of the opinion that the plaintiffs by abundant evidence, some of it very important documentary evidence, established, that the sale was by sample.

In the case of *Niehoff-Schultze Grocer Co.* v. *Gross* (205 App. Div. 67, 75; affd., 237 N. Y. 509) Mr. Justice McAVOY, writing for this court, said: "Lord MACNAUGHTEN, in the leading case of *Drummond* v. *Van Ingen* (L. R. 12 A. C. 284, 297), gives forcefully the office of a sample in the sale of goods: 'After all, the office of a sample is to present to the eye the real meaning and intention of the parties with regard to the subject-matter of the contract which, owing to the imperfection of language, it may be difficult or impossible to express in words. The sample speaks for itself.'

"The Sales Act or Sales of Goods Act provides in section 97 of our Personal Property Law (as added by Laws of 1911, chap. 571) that the only warranties which a seller makes in a sale by sample are: (a) That the bulk shall correspond with the sample in quality, (b) that, with a certain exception not here applicable, the buyer shall have a reasonable opportunity of comparing the bulk with the sample, and (c) that the goods shall be free from any defect rendering them unmerchantable, which would not be apparent on reasonable examination of the sample, if the seller is a dealer in goods of that kind. Now, granting that it was a question for the jury to determine whether or not the sale in the case at bar was a sale by sample (*Henry & Co.* v. *Talcott*, 175 N. Y. 385, 389, 390), it was clearly the duty of the court to charge the jury that if they should find that this was a sale by sample, then the only warranties which the defendant made were those above enumerated. * * *

"That the sale in the case at bar actually was a sale by sample, although the sample was exhibited to the plaintiff in connection with the purchase of the first lot of 100 bags and not in connection with the second lot of 400 bags, cannot be doubted. (*Zabriskie* v. *Central Vermont R. R. Co.*, 131 N. Y. 72.)"

The defendant also contended upon the trial that irrespective of whether the sale was a sale by sample, the goods shipped were of the highest quality; that the goods returned were an inferior

article of very poor quality and in fact were fraudulent German dyes; that heat and moisture and the long distance that the goods were shipped, together with the delay caused by the return of the goods may have caused deterioration. Defendant also contended that the goods returned contained much foreign matter, were part dye and part sugar, with the result that they were of very little value.

Plaintiffs offered very convincing evidence that the goods at the time they were received were not in accordance with the contract requirements, and that they promptly notified the defendant of that fact upon receipt of the first installment. The largest shipment was made after the first complaint, thus giving defendant ample opportunity to fully inspect the goods before sending the remaining orders. It is apparent from the testimony that the ingredients found in the goods returned were not the ingredients which would have been found if the goods were equal in quality to the sample or of the very best quality as the goods shipped were asserted to be by the defendant. It was also proved by plaintiffs that the goods were examined immediately upon arrival and were then found to be of a very inferior quality; that plaintiffs before their arrival had the goods sold to a responsible customer at a substantial profit which in itself tended to prove that they had no ulterior motive for returning the goods. By a completely connected chain of testimony, apparently truthful, and which remained unshaken on cross-examination, they established the fact that the goods returned were the identical goods that had been shipped by defendant. In some instances the container in which the goods were shipped was returned unopened.

The evidence of expert witnesses relied upon by defendant, much of which was inadmissible because a proper foundation was not laid for its admission, was afterwards on cross-examination shown to be of little value. A chemist testified with reference to the ingredients, which testimony was apparently the result of an analysis, but he afterwards admitted he had not made an analysis. The short course taken to admit this evidence was unwarranted and clearly erroneous. No foundation was laid to prove how, where or when many of the tests, analyses or the dyeings produced by defendant were made. The following testimony is one of many instances of the manner in which the testimony was admitted: " Q. Will you please state whether or not in the latter part of December Mr. Sparks gave you some samples of dyes which he said were taken from the bulk dye shipped to Shewan-Tomes and directed you to take them down to the United States Con-

ditioning & Testing Company and have them analyzed by Dr. Pierce? A. He did. Q. Did you do that? A. I did. Q. In March, 1919, did you also take to the Union Laboratory a sample of dyes and ask them to dye cotton with them? A. Yes, sir. Q. And are those the dyeings — did you receive such dyeings from the Union Laboratory (handing sample to witness). A. Yes; they were just twice as large as those. Q. I beg pardon? A. They were just twice as large as those. Half of them have been cut in two and handed to Shewan-Tomes."

By overwhelming evidence plaintiffs not only proved a sale by sample but also proved that the goods if sold by description were not in accordance with the description. (See Pers. Prop. Law, §§ 95–97, as added by Laws of 1911, chap. 571.)

The testimony was met by evidence which does not stand the necessary test to give it probative value. Much of the material evidence admitted on behalf of defendant, the value of which depends entirely on its source and authenticity, was not shown to be reliable.

Under the circumstances the verdict is against the weight of evidence.

The judgment should be reversed and a new trial ordered, with costs to the appellants to abide the event.

CLARKE, P. J., and FINCH, J., concur; SMITH and MERRELL, JJ., dissent.

MERRELL, J. (dissenting):

I am unable to agree with a majority of the court that the verdict of the jury in this case was against the weight of the evidence and that the judgment entered thereon should be reversed and a new trial granted. A careful examination of the entire testimony has convinced me that the jury was amply justified in reaching the verdict that it did. It saw the witnesses and was best able to pass upon the credibility of their testimony. Unless we are to substitute our opinion, drawn from the record, for that of the jurors who saw the witnesses and heard the testimony, we should not disturb their finding.

The testimony upon the trial presented two issues of fact, which were submitted to the jury by the trial court in a fair charge to which no exception of moment was taken. The first issue was as to whether the goods were sold by sample, and second, if they were, whether the goods delivered were up to the sample. The jury found a verdict generally in favor of the defendant, upon which judgment was entered dismissing the plaintiffs' complaint, with costs. Upon the whole evidence in the case, I am of the opinion

that the jury was justified in finding a verdict for the defendant, and that by a great preponderance of evidence it satisfactorily appears not only that the goods in question were not sold by sample, as claimed by the plaintiffs, but that, if sold by sample, the goods delivered were up to sample, and that any fault therein came from deterioration resulting from transportation and climatic conditions in connection with their shipment to Kobe, Japan, and the long delay before an examination of the goods was made by the plaintiffs.

As to whether the sale was made by sample, it appears that at the request of the plaintiff, the defendant, on May 16, 1918, furnished plaintiffs with samples of dyes and samples of malachite green crystals. It further appears that thereafter and in early July, pursuant to order, the defendant sold and delivered to plaintiffs a quantity of the malachite green crystal dyes in accordance with the sample which he had furnished the plaintiffs on May 16, 1918. It is, nevertheless, the contention of the plaintiffs that the order given by them and the sale of the 2,000 pounds of malachite green crystals on September 4, 1918, was a sale in accordance with the sample which had been furnished plaintiffs on May sixteenth. Plaintiffs' order for said dye stuffs under date of September 4, 1918, was in writing, and therein the plaintiffs requested the delivery to them by the defendant of 2,000 pounds of malachite green crystals, f. o. b. New York, all to be shipped to plaintiffs at Kobe, Japan. Nowhere in the order is it stated that the purchase and sale was by sample. In plaintiffs' complaint it is expressly alleged that the sale was " *by a sample then* [on or about the month of September, 1918] *exhibited by the defendant.*" The plaintiffs abandoned such claim upon the trial and made no pretense of any sample being exhibited at the time they gave the written order to the defendant. At the trial the plaintiffs claimed that the sale was by the sample which had been furnished by the defendant on the previous May sixteenth.

But even assuming that the sale was by sample, I think the evidence by a great preponderance indicates that the goods which were actually delivered by the defendant to the plaintiffs were at the time of such delivery up to the sample which had been furnished on May 16, 1918. A large amount of testimony is contained in the record, and numerous expert witnesses were sworn, both for the plaintiffs to show that the malachite green crystals which were delivered to the plaintiffs f. o. b. New York and were thereafter transported by them to Japan were of inferior quality, and on the part of the defendant that said crystals were in all respects of merchantable quality and in accordance with the contract.

Witnesses in behalf of the plaintiffs testified that the contents of the packages shipped to Japan, from analysis and samples taken, showed that said packages contained, instead of pure dyestuffs and malachite green crystals suitable for dyeing, a substance containing foreign matter, from twenty per cent to thirty per cent or more of which was insoluble and unfit for dyeing purposes. While said goods were being delivered by the defendant to the plaintiffs, the plaintiffs, according to the testimony of the defendant, required an additional 750 pounds of the crystals to be furnished at the contract price, and after 2,029 pounds had been delivered, the plaintiffs made complaint that the quality was not as represented by the defendant, and that their customers in Japan were complaining with reference to the quality of said dyestuffs. The defendant claims to have immediately notified the plaintiffs that the dyes were of the highest quality and equal in quality to prior like dyes which the plaintiffs had purchased from the defendant, and that the defendant had retained samples of the goods shipped to Japan and would have the same tested for quality; that thereupon the defendant did have said dyestuffs tested by the United States Conditioning and Testing Company of the city of New York, and also had tests made of samples of dyes submitted by plaintiffs and alleged by plaintiffs to have been taken in Japan from the dyes already shipped, and that said tests disclosed that the dyes shipped and which had been returned by the defendant, were up to standard, but that the sample dyes submitted to the defendant by the plaintiffs as a part of the goods shipped to Japan were spurious and inferior dyestuffs and were in fact sugar crystals which had been impregnated with a small amount of the malachite green coloring so as to resemble the pure malachite green crystals, and that said samples sent by the plaintiffs from Japan were German or Swiss products which had been substituted for defendant's goods; and that the defendant on or about December 28, 1918, notified the plaintiffs that the dyes which he had delivered were of good quality and defendant would entertain no claim on account of the quality thereof, but would cancel the unfilled orders for the dyes purchased by the plaintiffs on receipt of check for the agreed price of the dyes already delivered, which then amounted to 2,029 pounds; and that plaintiffs in accordance with such proposition paid the defendant for the goods already shipped.

Testimony was offered on the part of the plaintiffs that the malachite green crystals were not subject to deterioration through shipment to so great a distance as Japan, and that they were not appreciably affected by heat or moisture or other climatic conditions. On the part of the defendant, the defendant himself

was sworn as a witness and testified that heat and moisture would deteriorate the appearance of the dyestuffs; and that while the practical value thereof for dyeing purposes would not be materially lessened, still the appearance and salability would be affected and impaired. Other witnesses were sworn by the defendant to corroborate his contention that climatic conditions would affect the dyestuffs. The testimony of one witness in particular sworn in behalf of the defendant evidently carried great weight with the jury. This witness was J. Merritt Matthews, who testified that he was by profession a consulting chemist and had received the degree of Doctor of Philosophy from the University of Pennsylvania, from which he graduated in 1895; that thereafter he took two years' graduate work, and for nine years was professor of chemistry and dyeing at the Philadelphia Textile School; that he was then for three years manager of dyeing and finishing for cotton mills in New England, and became a consulting chemist in New York city in 1910, and in 1916 and 1917 was technical director of the dye factory of Martin, Orth & Hastings at Newark, and was consulting chemist for the Grasselli Chemical Company in their dyestuffs department; that he had written several books on the subject of dyestuffs and in particular a laboratory manual of dyeing and textile chemistry and a book on the application of dyestuffs; that he was a director of the Color Trade Journal since it had been in existence, about six years; that said journal was a magazine devoted to dyestuffs, their manufacture and application. The witness Matthews testified that he was familiar with the properties of malachite green crystals, and that he had analyzed a great many samples of malachite green and had done consulting work in the technicology of malachite green, its properties and its manufacture, and had used malachite green in dyeing; and that he had observed deterioration in the malachite green crystals; that while he was employed in the dyeing department in the cotton mills in New England, for several years he used malachite green to quite an extent; and that he had observed that if exposed to moisture, the crystals would cake together. One of the main objections raised by the plaintiffs and their witnesses to the commodity delivered by the defendant and found in the packages in Japan was that the crystals had caked or fused together. The witness Matthews testified that the dyeing properties did not necessarily deteriorate by such caking, but the appearance of the material did deteriorate, and that in time the dyeing properties might also. The witness Matthews described at great length the manner in which the crystals deteriorated, and stated that the said crystals were sensitive at all times to moisture and heat.

He also testified that he agreed with the analysis of Dr. Pierce who had examined the samples sent back from Kobe by the plaintiffs, and that one of the samples sent was clearly of German manufacture and was of a quality not made in this country. Matthews also testified that some of the packages of the goods sent by the plaintiffs from Japan showed plain evidence that the same had been subjected to moisture and heat. The defendant also showed that from an analysis of the samples of goods sold by the defendant and shipped by the plaintiffs to Japan, said goods were of first-class quality and substantially a standard grade of malachite green. This test was made by the United States Conditioning and Testing Company of New York city, and the evidence indicated that said testers were of high and unassailable standing in their business.

The repudiation by the plaintiffs of their contract and their belated claim, made after the armistice was signed, that the goods which they received from the defendant were of inferior quality, is quite in line with a large number of cases of repudiation of contracts as the result of the ending of the World War. The evidence in this case shows that the market for these dyestuffs became demoralized shortly before the plaintiffs made claim that the goods were not up to contract. It is perfectly plain that the plaintiffs, being unable to dispose of the goods which they had purchased of the defendant at the advantageous prices which prevailed at the time of the making of the contract, and to recoup themselves from unavoidable loss of a declining market, made claim that there was some fault with the goods shipped. At the time this contract was entered into, there was concededly a great demand for malachite green crystals in the Japanese market. With the signing of the armistice that demand ceased with disastrous results to the plaintiffs. There is little doubt that, had the World War continued, the plaintiffs would have had no difficulty in disposing of any dyestuffs which they received from the defendant, and that there never would have been any claim that said dyestuffs were not up to contract.

Upon all the testimony questions of fact were presented which were resolved by the jury in favor of the defendant upon ample evidence.

In my opinion, the judgment appealed from should be affirmed, with costs.

SMITH, J., concurs.

Judgment reversed and new trial ordered, with costs to appellants to abide the event.