**MOXIE INDUSTRIES, INC. and Richlife, Inc., Plaintiffs,**

v.

**Naura HAYDEN, a/k/a Naura Hayden Green, Haydenergy, Inc. and Energy Products, Ltd., Defendants.**

**No. 84 Civ. 3779 (RWS).**

United States District Court, S.D. New York.

Jan. 13, 1988.

Stephen Sayre Singer, New York City, for plaintiffs.

Irving P. Seidman, P.C., New York City (Irving P. Seidman, Allen L. Weintraub, of counsel), for defendants.

## OPINION

SWEET, District Judge.

These diversity actions were tried before the court, and upon the trial, prior proceedings and the post trial submissions of December 15, 1987, judgment will be entered in favor of the plaintiff in 84 Civ. 3779, Moxie Industries, Inc. ("Moxie") and RichLife Inc. ("RichLife") against the defendants Naura Hayden ("Hayden"), and Haydenergy, Inc. ("Haydenergy") and Energy Products Ltd. ("Energy") and dismissing the complaint in the companion case, 84 Civ. 4659, in which Hayden is the plaintiff and Moxie the defendant. What follows are the findings and conclusions upon which the judgments will be entered.

### Prior Proceedings

Moxie filed its complaint in this court on May 30, 1984 after Hayden had commenced her action in the Supreme Court of the State of New York on May 15, 1984. Following Moxie's removal of the state action to this court, Hayden's motion to remand was denied on August 13, 1984, and the cases thereafter proceeded through discovery and trial as if formally consolidated.

On December 3, 1985 the parties stipulated to a trial before a magistrate on the question of damages, a jury trial having been demanded with respect to liability. The Moxie complaint alleged a number of causes of action, including a claim for libel which was dropped by Moxie on the eve of trial as well as the demand for a jury.

The issues proceeded to trial before the court by agreement of the parties to waive a jury. Evidence was presented on October 7, 8, 19, 20 and 21, 1987. By agreement of the parties final submissions were made on December 15, 1987.

### Facts

Hayden is a New York resident, and an attractive and compelling "writer and personality in the field of nutrition," (License Agreement March 1, 1978 between Moxie and Hayden). Haydenergy and Energy are New York corporations with their principal place of business in New York.

Moxie is a Massachusetts corporation that manufactures and sells soft drinks, vitamins and nutritional products. Moxie's principal place of business at the time of filing the action was in Norcross, Georgia, although it is now in California. Plaintiff RichLife, Inc. ("RichLife") is a wholly-owned subsidiary of Moxie and a Delaware

corporation with its principal place of business in Anaheim, California. There is diversity between the parties, and the amount in controversy exceeds $10,000.

Hayden wrote and promoted a book entitled "Everything You Want to Know About Energy But Were Too Tired To Ask" and developed various formulas for products containing vitamins, including one termed "Naura Hayden's Dynamite Milkshake" (the "Milkshake"). She conferred with an experienced consultant in merchandising and the food business, Don Friedkin ("Friedkin"), who was familiar with Moxie and its chief executive, Frank Armstrong ("Armstrong"). As a result of negotiations and Friedkin's efforts, Moxie and Hayden entered into a License Agreement on March 1, 1978 under which Hayden licensed Moxie to use her name and likeness and trademarks and to create and sell nutritional food supplements, including the Milkshake. Hayden agreed to promote the products covered by the agreement. Both parties set out to perform under the agreement.

The principal product to be sold by Moxie and RichLife was the Milkshake, which, among other things, contained lecithin, a phosphotide containing fatty acid molecules. Lecithin becomes rancid over time when exposed to oxidation. The time for the reaction to take place depends upon a number of factors, such as temperature, mixture content within the product, the time since the compound was created, and the condition of the lecithin at the time of packing. When rancidity occurs, it can be determined by odor and by chemical analysis. If the Milkshake is rancid, it is not appropriate for consumption. No evidence was adduced concerning any action by any of the parties to conduct tests during manufacture of the Milkshake, to make any determination of an appropriate shelf life, or to adopt procedures to insure against rancidity.

After the agreement of 1978, Hayden had complaints concerning the products manufactured by Moxie and RichLife, in particular, rancidity, oversize pills and failure to label the contents properly by omitting the sodium content. These difficulties were the subject of correspondence and assurances by Moxie and Armstrong that corrective action would be taken. Hayden also expressed her dissatisfaction with the funding of promotions for her products and the sales coverage by RichLife personnel.

By the spring of 1982 these concerns resulted in a meeting between Armstrong, Hayden, Friedkin, and Gary Stevens, who was assisting Hayden. Armstrong recognized that Hayden wanted to run her own business, and an agreement in principle was reached to transfer the marks back to Hayden, to permit Hayden to finance this repurchase and to continue to supply the product until Hayden could make other arrangements.

Inventory statements were prepared, as well as a projection estimating gross annual sales of over $1 million, and representations were made concerning the proper method to eliminate the rancidity problem. Hayden was pleased at the tone and substance of these discussions.

Moxie and Hayden then entered into a written agreement dated as of December 17, 1982 (the "Agreement") which is the contract giving rise to these actions. It provided for the purchase by Hayden and sale by Moxie of assets which had been the subject of the earlier agreement. Moxie delivered to Hayden a written assignment or transfer of RichLife's trademark, "Naura Hayden's Dynamite Milkshake," and all rights to products bearing Hayden's name.

The Agreement provides in paragraph 6(A) that Moxie represents and warrants that "[t]he Inventory is in compliance with all applicable governmental regulations and consists of items which when shipped shall be current, usable and merchantable." The physical text of the Agreement establishes that the words "when shipped shall be" were added to the warranty clause as an amendment and were Hayden's idea.

Hayden granted Moxie a general release and signed and delivered to Moxie a series of four promissory notes altogether totalling $500,000 in principal, plus interest as stated in each note.

The first promissory note, for $100,000, was payable with interest on December 15, 1983. The next on December 15, 1984 and the remaining two notes of this series, each for $150,000, were payable, respectively, on December 15, 1985 and December 15, 1986. Interest on these notes, before they became due, was payable on December 15 each year.

Hayden signed and delivered to Moxie a fifth promissory note for $152,674.20, payable to Moxie without interest in six equal installments of $25,445.70, on the last day of the months of January through June 1983 in payment for certain Hayden product line inventory sold and delivered to Hayden under the Agreement. The inventory was described in the Bill of Sale and annexed Schedule of Inventory. In addition, Hayden made an additional purchase of inventory from RichLife for which she was billed in March 1983 by an invoice for $63,158.55 payable in five equal installments and for freight charges of $8,335.29 and additional inventory of $8,271.36.

After the Agreement was reached, Sheldon Freund ("Freund") became primarily responsible for the Hayden business. The inventory was stored at warehouses, some of which were operated by Balanced Food, Inc., a national health foods distributor, starting in early 1983. Hayden continued her promotional efforts, but was also involved in the writing and promoting of her book published in 1983, "How to Satisfy A Woman Every Time."

Hayden paid $76,337.10 to Moxie in 1983 representing the first three of the six installments on the note given in connection with the inventory. No principal or interest was paid on the note due on December 15, 1983 or on the subsequent notes representing the purchase price.

Despite Hayden's talent as a salesperson, demonstrated in the marketplace and at trial, all did not go well for her health food business in 1983. The difficulties facing Hayden were the subject of discussion with her counsel on February 22, 1983. The principal topic was consideration of an action against RichLife. The grievances against RichLife considered at this February meeting, according to a follow-up letter of July 22, 1983 from Hayden to her attorney, were "changing my formula on the Dynamite Milkshake without my consent, doubling the size of my vitamin pills thereby changing my formula without my consent and numerous other things." In addition, Hayden noted without specification, "we now have an even more valid reason to make claims against them." On the day following the February meeting, Freund complained to RichLife only about packing procedures that had resulted in damaged cans.

Meanwhile, early in 1983 a new supplier for the Hayden products was obtained, Valentine Enterprises, Inc., and a practice of shipping on a first-in-first-out basis was adopted. By June 1983, almost all of the products manufactured by RichLife had been shipped to the retail stores.

By March 1983 Moxie had noted Hayden's obligations "past due," and called this to her attention by letter from Moxie dated May 1, 1983. At no time did Hayden or her officers or employees challenge the amounts claimed to be due and owing under the notes. During 1983 Hayden made additional loans to her company in excess of $70,000 to provide capital.

In May 1983 Hayden lunched with Armstrong. According to her testimony, she threatened to sue Moxie for, among other things, supplying rancid products and Armstrong offered to help her obtain capital and to postpone the payments if she would forego the action. Moxie did not present any testimony from Armstrong, but there is no contemporaneous documentation of Hayden's version of the conversation. However, by letter of June 10, 1983 Armstrong offers his view of the material that had been presented to him and offered his detailed suggestions as to the manner in which a presentation seeking capital should be made. The tone and content of the letter belie Hayden's assertion of an oral threat to litigate, which remains unsupported except for Hayden's trial testimony which, in this instance, is an instance of the wish overcoming the fact as it was testified to at the time of her deposition.

The June 10 letter from Armstrong was followed by a June 23, 1983 letter in which Armstrong stressed the need for inventory and distribution, congratulated Hayden on her book and urged her to spend more time in promoting the Milkshake, suggesting that such promotion in the long run would be more valuable to her than her book business. The letter is sympathetic and helpful in tone and belies awareness of a potential legal controversy. On the contrary, it speaks as a creditor seeking to help a forgiven debtor achieve a sound financial posture.

In July 1983 in the course of a health food convention in Denver, Hayden and Armstrong breakfasted together. According to Hayden's trial testimony, the discussion proceeded substantially as in May. However, her letter of July 29, written shortly after the meeting contains no hint of the threat of litigation. Even an unsophisticated litigant, assuming Hayden to be such, does not write her potential defendant and state: "You're a wonderful man, Frank, and I really appreciate your fairness and honesty." The entire thrust of the letter is an effort to renegotiate the price of the buy-back and reduce the outstanding obligation:

> Because you are a fair man and you are trying to help us (and thank God you are) I know you'll work out something that won't kill us, something we can live with that will allow us to grow a bit as I believe we can and will grow.

Again Hayden's powers of promotion and persuasion have overcome her recollection. In fact, there is no documentary evidence in this record of any rancidity in the Hayden products until the summer of 1983, and that is simply an informal record of one oral complaint.

However, the record does contain testimony from the warehouse operator that complaints of rancidity were received in 1983 and products replaced, and a Hayden salesman testified that in August, September and October 1983 complaints were received from health food stores and products were replaced. However, no documentary evidence of these transactions has been presented, and, therefore, no proof that the defective product, assuming it to be so, was manufactured by RichLife.

Hayden submitted her product to laboratory analysis in the fall of 1983 to determine the accuracy of the labelling. One consumer became sick in February 1984 after drinking a Milkshake and without medical opinion attributed her illness to the Milkshake. Other complaints of rancidity were received. In November 1984 and January 1985 Hayden had tests conducted on her products and rancidity was found to exist. No history of the products tested was presented, and no link to RichLife was established.

On December 22, 1983 counsel for Hayden advised Moxie that she had assigned her rights and obligations under the Agreement to Energy Products Ltd.

By December 22, 1983, in a letter from its Deputy Chief Financial Officer, Moxie proposed that the payments on the December 1983 note be deferred, but that any 1984 payments would be used to pay for the merchandise delivered and any overdue interest payments. Again Moxie expressed its belief that financing could be obtained and that the business had the potential for success. This letter was met by a lawyer's letter of January 6, 1984 on behalf of Hayden asserting for the first time in written form since the buy-back "the fraud upon the purchasing public of receiving goods which are mislabelled and of inedible quality." In addition a claim for unfair competition was set forth. War had been declared.

In February 1984 Hayden recalled certain of her products, and in May the state court complaint was filed. On November 14, 1984 she wrote to her former lawyer, recalling the February 22, 1983 conference and the problems relating to the release executed at the time of the Agreement. The November 1984 letter contained no reference to any discussions concerning rancidity in February 1983 or thereafter.

*Conclusions*

The Agreement spells out a warranty of merchantability in paragraph 6. As permitted under by New York Uniform Commercial Code §§ 2–314, 2–316 (McKinney's

1964), that warranty was modified by an October 30, 1985 stipulation of the parties to eliminate any claim of breach resulting from mislabelling or failure to meet government specifications. Under N.Y.U.C.C. § 2–513(1), a buyer is given a reasonable time to inspect goods once they "are tendered or delivered or identified to the contract for sale," and rejection of goods must come within a reasonable time after their delivery or tender. N.Y.U.C.C. § 2–602(1).

Revocation of acceptance, if grounds exist, must occur within a reasonable time after the buyer discovers or should have discovered the defect and before any change in the goods not caused by their own defects. N.Y.U.C.C. § 2–608. Hayden at no time had any program of inspection and review for the product. Where there are defects discoverable by inspection at the time of sale, a buyer will not be excused from making that inspection and rejecting the goods within a reasonable time. See Miron v. Yonkers Raceway, Inc., 400 F.2d 112 (2d Cir.1968). Particularly in view of her complaints about rancidity prior to the Agreement, Hayden's failure to inspect the products was unreasonable.

■ There is no credible evidence of rejection of any of the inventory at any time, or of any notice of breach of the warranty of merchantability before January 1984. Further, there is no evidence of any complaints from Hayden about the inventory other than the Freund complaint of February 1983 relating to damage to goods resulting from improper packing. The January 1984 letter was too late as a notice of breach, rejection or revocation of acceptance, occurring as it did more than nine months after delivery. See Tabor v. Logan, 114 A.D.2d 894, 495 N.Y.S.2d 67 (2d Dep't 1985). Acceptance resulted from the failure to reject the perishable inventory within a reasonable period after it was received. See Niehoff–Schultze Grocer Co. v. Gross, 205 App.Div. 67, 199 N.Y.S. 196 (1st Dep't) (5 months), aff'd, 237 N.Y. 509, 143 N.E. 722 (1923); Brunella v. Bracchi, 131 Misc. 301, 226 N.Y.S. 738 (1st Dep't 1928) (5½ months).

In addition, Hayden had paid without protest the first three installments of the inventory note, the third of which was due the last day of March 1983. Cf. Simon & Schuster v. Howe Plastics & Chemicals, 105 A.D.2d 604, 481 N.Y.S.2d 82 (1st Dep't 1984). By any reasonable standard, Hayden's conduct constituted acceptance of the goods. See N.Y.U.C.C. § 2–606.

Having accepted the goods, Hayden had the burden of proving its defense of breach of the warranty of merchantability and of the Agreement, John Fabick Tractor Co. v. Lizza & Sons, Inc., 298 F.2d 63 (2d Cir.1962), and has failed to adduce a preponderance of the evidence to meet meet that burden.

Defendants' expert testified that tests of samples of the Milkshake taken from the warehouses at the end of 1984 showed they were rancid, but he agreed that these tests did not indicate whether the Milkshake was rancid when delivered to defendants, and his testimony did not indicate the condition of the inventory two years earlier in time. See Niehoff–Schultze Grocer Co. v. Gross, 205 App.Div. 67, 199 N.Y.S. 196 (1st Dep't), aff'd, 237 N.Y. 509, 143 N.E. 722 (1923). Further, even if a rancid product be assumed in 1983, there is insufficient evidence to establish that Moxie or RichLife was responsible for its manufacture.

■ Hayden's fraud claim simply duplicates the claim for breach of warranty. The risk of having to pay damages for nonperformance is not increased by alleging that the party did not intend to perform. See Spellman v. Columbia Manicure Manufacturing Co., Inc., 111 A.D.2d 320, 489 N.Y.S.2d 304 (2d Dep't.1985); Tesoro Petroleum Corp. v. Holborn Oil Co., 108 A.D.2d 607, 484 N.Y.S.2d 834 (1st Dep't.1985). Further, a claim of fraud in the inducement must, under New York law, be proven by clear and convincing evidence. Mix v. Neff, 99 A.D.2d 180, 473 N.Y.S.2d 31 (3d Dep't 1984). Hayden has adduced no such evidence. Armstrong insisted that any rancidity was promoted by the large amount of lecithin in the Milkshake. Further, Armstrong negotiated and signed an Agreement which delayed the start of Hayden's payments for the business for a year and which, with respect to the inventory,

called for payments in installments as the inventory was sold after its receipt by defendants. Such evidence does not establish that Moxie was scheming to dump bad products. Finally, Hayden adduced no competent evidence to establish any of the elements of unfair competition, nor to establish any breach of any undertaking by RichLife to refrain from competition.

The counterclaims are therefore dismissed.

As set forth in the findings Hayden has failed to perform the Agreement and to pay the notes issued. Moxie is entitled to judgment against Energy Products Ltd. on the series of four notes given in payment for the business, the principal amount of which total $500,000, as well as for the outstanding balance of $76,337.10 on the inventory note. It is also entitled to judgment against Hayden for one half the sums due on the three March 2, 1983 invoices which total $79,765.20 as described in section 13(d) of the Agreement.

Interest on the series of four notes shall be calculated at the rates set forth therein through January 17, 1984, the date of plaintiffs' notice of default, and thereafter at 9% from the day each of them accrued. Moxie is entitled to costs.

Enter judgment on notice.

IT IS SO ORDERED.