JEFFERIES & COMPANY, INC.,
Plaintiff,

v.

Yura ARKUS–DUNTOV et al.,
Defendants.

No. 73 Civ. 1407 (MIG).

United States District Court,
S. D. New York.

April 12, 1973.

Donovan, Leisure, Newton & Irvine, New York City, for plaintiff; by Roger Kapp, Allan Freedman, M. Lauck Walton, New York City, of counsel.

Gilbert, Segall & Young, New York City, for defendant Yura Arkus-Duntov; by Robert Layton, Fredrick Sherman, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant Chase Manhattan Bank, N.A.; by Briscoe R. Smith, New York City, of counsel.

Shea, Gould, Climenko & Kramer, New York City, for defendant United Missouri Bank of Kansas City; by Bruce Hecker, New York City, Landon Rowland, Kansas City, Mo., of counsel.

GURFEIN, District Judge.

Plaintiff ("Jefferies"), a broker member of the New York Stock Exchange, sues to rescind a transaction in which it acted as a broker for the defendant Arkus-Duntov ("Duntov") in the sale of 24,475 shares of common stock of Equity Funding Corporation of America ("Equity Funding"). It also seeks to enjoin the payment of two certified checks made by it to Duntov and to the defendant United Missouri Bank of Kansas City ("United Bank") in the respective amounts of $192,256.35 and $217,448.08, drawn in payment for the stock sold.

A temporary restraining order was signed by this Court on April 3, 1973 enjoining the payment of the two checks by the Chase Manhattan Bank, N.A. ("Chase") on condition that the plaintiff post a bond for the full amount of the checks, $409,704.43, and setting the matter down for hearing on a preliminary injunction on April 9, 1973 at 10 a. m. .

The hearing was begun on April 9 and was adjourned after the completion of the plaintiff's case, subject to the immediate taking of the deposition of Duntov by the plaintiff and the resumption of the hearing on April 10 at 3 p. m. The hearing continued on April 10 and was concluded that evening.

The affidavits admitted in evidence by consent and the oral testimony reveals the following.

Duntov was on March 26, 1973 an Executive Vice-President of Equity Funding. He was also a member of its five man executive committee and of its nine member board of directors.

On March 26, 1973 Jefferies was asked by North American Equity Corporation ("North American"), a broker dealer which was a 100% subsidiary of Equity Funding, to sell 24,475 shares of Equity Funding common stock on the Stock Exchange. Jefferies effected the sales on the New York Stock Exchange that day at prices ranging from 16½ to 17⅜. There was no disclosure to Jefferies at the time of the order that the sale was for the account of Duntov, or that he was an Executive Vice President and a director of Equity Funding.

The settlement date for the March 26 sales was April 2. Before the settlement date arrived, on March 27 at 12:45 p. m. E.S.T., the next day after the sales in question, the New York Stock Exchange halted trading in Equity Funding common stock. On March 28 the Securities and Exchange Commission ("Commission") suspended trading in all securities of Equity Funding. On April 2, the board of directors, including Duntov, voted to have Equity Funding consent to a final judgment of permanent injunction sought by the Commission. They also "informed the corporation that they will resign their directorships upon the appointment of a new board of directors . . ." (¶ 3 of consent to final judgment).

On April 3, 1973 the Commission instituted an action in the United States District Court for the Central District

of California charging that Equity Funding was engaged in acts and practices constituting violations of Sections 10(b), 13(a) and (b) and 14(a) of the 1934 Act. Specifically, the complaint alleged that Equity Funding engaged in "a massive and prolonged effort to alter its books and records, principally those of Equity Funding Life Insurance Company (EFLIC), to show the sales of insurance policies, the receipt of premium payments, the creation of assets and the establishment of reserves, when, in fact, such insurance policies had not been sold, premium payments had not been received, assets did not exist, and the reserves had not been established." The complaint further alleges that Equity Funding "acting through certain of its officers and employees and those of its subsidiaries, principally EFLIC, caused insurance policy files to be created and maintained in the names of fictitious persons, persons whose policies had lapsed, persons who had applied for but were denied insurance, [and] caused insurance policies to be issued to persons upon which no premiums were paid and caused the face amount of existing policies to be increased without the knowledge of the policyholder." It is also alleged that Equity Funding "caused said policies and fictitious insurance policies to be sold or conveyed to co-insurers and re-insurers and received therefrom payments of monies in excess of premiums purportedly received by EFLIC on the initial sales" and that Equity Funding "caused death claims on said fictitious and false policies to be presented to the co-insurers and re-insurers in order to collect death benefits thereon, and surrendered a number of said fictitious and false policies in order to receive the cash surrender values thereon." Finally, the Commission's complaint asserts that Equity Funding "caused financial statements to be prepared and disseminated to the investing public reflecting substantial earnings which were in fact false and fictitious" and that it "caused such false and fictitious financial statements to be filed with the Commission and other regulatory agencies, including the New York Stock Exchange and the state insurance authorities, and in such manner did thereby willfully, fraudulently and falsely report and represent the financial condition of Equity Funding Corporation and its subsidiaries."

As indicated, Equity Funding consented to the injunction on April 3.

Earlier on April 2 the California Insurance Department instituted an action in the Superior Court of the State of California entitled "Payne, Insurance Commissioner v. Equity Funding Life Insurance Company" in which the Commissioner asked the Court to appoint a conservator for EFLIC, a subsidiary of Equity Funding. The verified application stated that the California Insurance Commissioner had been notified by the Illinois Insurance Commissioner that $24,000,000 in bonds, represented by EFLIC to have been on deposit with the American National Bank of Chicago were not on deposit as represented. The California Commissioner also charged that there were life insurance policies recorded on the books of EFLIC which were wholly fictitious.

Other official actions occurred within a few days of the large stock sale by Duntov, with the likelihood that there were rumblings to important officers earlier. Moreover, on March 12, 1973 the Illinois Insurance Department had begun a surprise audit of the financial condition of EFLIC. Preliminary investigation disclosed that a substantial number of bogus policies had been issued by EFLIC and that 20 million dollars of bonds listed as its assets and purportedly held by the American National Bank of Chicago were not there. The investigation, commenced on March 12, had advanced so far by April 2 that on the latter date a verified petition was filed in the case of People ex rel. Fred A. Mauck, Director of Insurance of the State of Illinois v. Equity Funding Life Ins. Co., & Equity Funding Corp. of America (No. 73–1019–Cr) in the Circuit Court for the 18th Judicial Circuit, DuPage County, Illinois.

On April 3 Equity Funding and EFL-IC were ordered to cease and desist from various activities including the selling of life insurance in Illinois.

Although, in the time available, the plaintiff has been unable to pinpoint exactly when the executive officers and directors learned of the serious violations that were uncovered in the Illinois investigation, it is a fair inference that notice must have been brought home to the directors of Equity Funding that all was not ship-shape some time before the suspension of trading on March 28. The sales of stock here involved were made only a week before official court action by the Commission and the Insurance Commissioners. It is a fair inference that the Illinois investigation, by then two weeks old, had come into the ken of directors and officers like Duntov, although Duntov has denied knowing that it was anything but a routine triennial examination.

The sudden sale of 24,475 shares plus about an additional 16,000 shares, representing about 80% of Duntov's holdings (49,911 shares) of Equity Funding within a week before the board agreed to a consent injunction is highly suspicious. That is particularly true because in November, 1972 Duntov sold only 300 shares and in December, 1972 only 900 shares. In the two and a half years before the March 26, 1973 trades he never sold more than 2,000 shares in a month, and only in March, 1971 did he sell as many as 2,000 shares.

Let us now revert to the activities of Jefferies from March 26 when it received the order to sell from North American to the present. On March 26, Jefferies sold the entire block of 24,475 shares to member firms. The Stock Clearing Corporation by a balance order told Jefferies to deliver a net balance of 19,300 shares to Hayden, Stone, a member firm, and the balance to other brokers. On March 29, confirmation slips had been received by Jefferies from North American indicating that delivery

of the 24,475 shares would be made by United Bank.

On the settlement date, April 2, a total of 24,475 shares were presented at the New York office of Jefferies; certificates representing 13,000 shares were presented by United Bank and certificates for the remaining 11,475 shares were presented by the Franklin National Bank ("Franklin"). The confirmations from United Bank had not shown on their face the name of "Duntov" but the certificates were all in the name of "Yura Arkus-Duntov," and the securities control ticket of Franklin showed "R/N/O Yura Arkus-Duntov," and directed payment to be made to the latter at 60 East 40th Street, New York. The confirmations from North American also disclosed that the sale was for the account of "Yura Arkus-Duntov."

On April 2, pursuant to written instructions from Franklin and United Bank, Jefferies drew the two checks on Chase, as stated above. Later on April 2, the settlement date, John Muscara, an officer of Jefferies in charge of its clearance department, told Adam A. Halaszynski of the Los Angeles office of Jefferies that one of the checks had been made to "Yura Arkus-Duntov." Inquiry was made in Los Angeles and Muscara was informed by his Los Angeles office that Duntov was an officer of Equity Funding and an insider, which Muscara had not known up to that time. The information was given to Muscara at about 9 a. m. New York time on April 3. By that time Muscara had already delivered the checks for the proceeds of sale.

When Muscara found out that Duntov was an officer and presumably an insider of Equity Funding, he made the decision to call Hayden, Stone and "invite" them to return the stock. Hayden, Stone still had the shares in their possession, and gave them back to Jefferies that day, reversing the transaction. The opposite number to Muscara at Hayden, Stone, a Vice-President named

Anthony Fidele, testified that he knew nothing of Jefferies "inviting" the stock back. All Fidele knew was that his cashier saw the name "Duntov" on the stock certificates and recognized him as an officer of Equity Funding. Hayden, Stone refused to accept delivery, on Fidele's version, on April 2.

This left Jefferies holding 19,300 shares of the stock which it had sold to Hayden, Stone for the account of Duntov, but with two checks outstanding for $409,704.43 which it had sent out on April 2, after assuming that it had been credited by the stock clearing house with the net proceeds from the sales of March 26.

In the meantime the checks had been certified, not by Jefferies but by United Bank and by Duntov.

On April 3 Jefferies obtained the restraining order from this Court with a show cause order returnable on April 9. Before the return date, on April 6, the Wall Street Journal carried the story that the New York Stock Exchange had ruled that trades in Equity Funding stock made before the suspension of trading were to be honored. At this juncture Muscara clipped the item from the newspaper, attached it to the certificates of stock and redelivered to Hayden, Stone on April 6, requesting payment under the Exchange's ruling. But Hayden, Stone refused to accept delivery, writing on the delivery slip "see ruling." When Muscara got the stock back he called Hayden, Stone to find out what they meant by the notation and was told, as he wrote it on the slip, "10B5 SEC Rule 7920–1934–Sec. 29."

Muscara understood this to mean that Hayden, Stone was not required to accept a fraudulent transaction.

United Bank comes into the picture in the following way. Duntov had an outstanding loan at the Bank in the amount of $210,000. The loan was secured by 27,692 shares of common stock of Equity Funding. On March 26, Duntov instructed United Bank "to sell from the total common stock of Equity Funding Corp. of America held as collateral for my account the number of shares required to repay my total indebtedness— $210,000 plus accrued interest through settlement date" (Ex. 1, telegram attached to Affd. of Theodore C. Chapman). The Bank was instructed to sell the shares, which amounted to 13,000, through North American. It did so and was later informed that Duntov had also sold an additional 12,000 shares of the 27,692 shares held by the Bank.

On March 27, the Bank was informed by North American that settlement of the 13,000 share sale would be made in New York through Jefferies. On March 28, Duntov's office instructed the Bank to send the additional 12,000 shares mentioned to New York for settlement through Donaldson Lufkin & Jenretts, Inc. ("Donaldson").

United Bank arranged for delivery of the additional 12,000 shares for April 3, *the day after* the settlement date so that payment of the 13,000 shares which were sold for settlement on Monday, April 2, would already have wiped out the loan. (Ex. 1, attached to Affd. of Byron McReynolds). On April 2, United Bank was informed by Duntov's office that April 2 was also the settlement date for the 12,000 shares and that they had to be delivered that day. The Bank, as a courtesy to Duntov, concluded to certify the Jefferies check to it, which would amount to $217,448, and release the other 12,000 shares for late delivery to Donaldson that same day.

On April 2 at 11 a. m. United Bank's security clearing office in New York delivered to Jefferies certificates representing the 13,000 shares in the name of Duntov. At 1:30 p. m. it picked up Jefferies' check for $217,448.08, promptly had it certified by Chase and deposited it that afternoon to its account at Manufacturers Hanover Bank.

At about 3 p. m. on April 3, United Bank received a call from Jefferies ad-

vising that they were going to stop payment on the certified check.

In recapitulation it appears that Duntov on March 26 sold a total of 40,000 to 41,000 shares of Equity Funding common, of which 24,475 were sold through Jefferies and 12,000 through Donaldson.

The defendant Duntov contends that the plaintiff has failed to state a claim for relief and is, therefore, not entitled to an injunction. He contends that Jefferies has no standing to sue Duntov, its customer, under § 12 of the 1933 Act or § 10(b) of the 1934 Act, because Jefferies is neither the ultimate purchaser nor a "forced" purchaser of the securities involved. He also contends that the plaintiff is not a purchaser because of the doctrine of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2 Cir. 1952). Finally, he contends that an injunction should not be granted, in any event, because there is no showing that the plaintiff is likely to succeed in this litigation and because there is no showing that the plaintiff will be irreparably harmed.

The complaint itself, drawn hastily, does not allege that the plaintiff was a "purchaser" of the Equity Funding stock. It merely alleges that the plaintiff sold stock *for* the defendants, which was not registered, in violation of § 5 of the Securities Act, and that "in connection with" the sale the defendants employed a scheme to defraud. While it alleges that the plaintiff has been damaged in the amount of $409,704.43 it does not say how or why. It seeks rescission of "the sale by plaintiff of the shares on behalf of North American, Duntov and United Missouri."

The assumption that the "sale" sought to be rescinded was a sale *by Jefferies* to the member firms who bought Equity Funding stock for it was apparently based on the information given to the draftsman of the pleading by Muscara, in charge of Jefferies' clearances, that when he discovered on April 3 from Jefferies Los Angeles office that Duntov was an Executive Vice-President of Equity Funding, he called someone at Hayden, Stone "inviting" them to disaffirm the transaction, and Hayden, Stone returned the certificates.[1] If that was truly the situation on April 3 when the complaint was verified by Muscara, the status of Jefferies was that of a volunteer, and the complaint could not allege that Jefferies was a "forced" purchaser because of a refusal by Hayden, Stone to take delivery. We put aside for the moment the right of a selling broker to rescind a sale against his principal when he discovers that alleged securities laws violations may have been committed only after he has actually sold the securities.

For certain events occurred after April 3 which, while not presently the subject of an amended complaint, can be made such. Fed.R.Civ.P. 15(b). On April 6, Jefferies re-tendered delivery of 19,300 shares of Equity Funding common to Hayden, Stone on the basis of a ruling by the New York Stock Exchange that all trades before the stop on trading should be honored. This time it is clear that it was Hayden, Stone which unequivocally refused to accept the stock, apparently claiming that the trade was void under § 29 of the Exchange Act, 15 U.S.C. § 78cc.[2]

On that state of facts, Jefferies now has the shares only because Hayden, Stone refused to accept delivery on the ground that Duntov had allegedly violat-

1. Hayden, Stone was not the actual buyer. Under the practice of the stock clearing corporation accounts between member firms are settled on a net basis, regardless of who actually sold to whom. On April 2 it happened that Hayden, Stone was entitled to a net delivery of 19,300 from the clearing corporation and Jefferies was obligated to deliver the same amount. Accordingly, Jefferies was instructed to deliver that number of shares to Hayden, Stone to "net out" the day's transactions on Equity Funding common.

2. The theory presumably was that Jefferies as broker for Duntov was asserting "the rights of [a] person, who in violation of [a] provision, rule or regulation, shall have made or engaged in the performance of any such contract."

ed the securities laws.[3] Jefferies now seeks to give the shares back to Duntov. But it cannot simply return the shares and wait to be sued by Duntov because it had issued checks for the proceeds in the mistaken belief that it had already been credited with the proceeds of sale by the stock clearing corporation—all before it discovered that the certificates delivered on April 2 were registered in the name of Duntov and that he was an officer and director of Equity Funding. Jefferies had thus become a "forced" purchaser of the shares from its customer, Duntov.

In American Bank & Trust Co. v. Barad Schaff, 335 F.Supp. 1276 (S.D.N.Y.1972), this Court held that a bank, whose customer defaulted on repaying the moneys advanced by the bank to pick up securities for the customer's account, had standing to sue an allegedly defrauding seller of unregistered securities both under § 12 of the Securities Act and § 10(b) and Rule 10b–5 of the Exchange Act. I noted there that "the purpose of affording a private remedy by statute (§ 12) was primarily to discourage the sale of securities without registration" (at 1280) and that the statutory remedy is not limited to "investors." In sum, the bank there, for reasons beyond its control, ended up being a "purchaser from him" (§ 12) [the fraudulent seller] "as if it had acquired the stock directly from [the fraudulent seller]" (at 1279).

Adhering to my ruling in the *American Bank* case that privity was not required for standing to sue under § 12 in the unusual circumstances of that case, the same *ratio decidendi* applies to the standing of Jefferies to sue. In the *American Bank* case it was the *purchaser*-customer who defaulted; in this case it is the *seller*-customer who refused to accept rescission. The result is the same in either case. The plaintiff has become an involuntary purchaser of either an allegedly unregistered security or of a security in connection with which there has been an alleged § 10(b) violation.

A. T. Brod v. Perlow, 375 F.2d 393 (2 Cir. 1967) established that although a broker is an agent for his customer, he may nonetheless sue the customer who defrauded him in violation of the Exchange Act. Judge Kaufman noted that Rule 10b–5 "was designed to protect both investors *and* "the public interest.' We cannot understand . . . any rationale which would restrict or inhibit appropriate private rights of action to enforce the Rule to those brought by 'investors'" (375 F.2d at 396; emphasis in original).

Although the *Brod* case, *supra*, did not involve § 12, its reasoning is applicable. In any event, it is authority for the standing of Jefferies under § 10(b). The broker-plaintiff in *Brod* was held to be a "purchaser" (375 F.2d at 397).

This liberal interpretation of standing is essential to preserve the integrity of the securities markets. As Judge Timbers said recently: "The securities laws seek to prevent restrictions which distort the market's estimate of value." Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, 2 Cir., 480 F.2d 341 at 357.

Nor can it be doubted that there is causation here. The defendant Duntov set in motion a force which was meant to affect investors, but the selling broker became the victim. *Cf.* Heit v. Weitzen, 402 F.2d 909 (2 Cir. 1968).

The contention that the *Birnbaum* rule destroys the standing of the broker to sue for violations of Rule 10b–5 is refuted by A. T. Brod v. Perlow, *supra*. And the Supreme Court has recently taught that a fraud in connection with a purchase and sale that was not the initial purchase and sale may, nevertheless, be actionable. Supt. of Ins. of N. Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

---

3. Hayden, Stone purportedly refused to accept an earlier delivery because delivery was in an improper amount as well.

The gravamen of the complaint on Rule 10b–5 is that Duntov employed a device, scheme and artifice to defraud the plaintiff and engaged in fraud and deceit in that he omitted to state material facts to the plaintiff with respect to the business, operations and financial condition of Equity Funding and its subsidiary EFLIC. These omitted facts are alleged to have been that (a) the price of Equity Funding stock had been artificially inflated by the defendant and others; and that (b) "the assets, insurance in force, sales and earnings of Equity Funding, and of its subsidiary, Equity Life, had been falsely inflated by, among other things, including an unknown but substantial amount of 'bogus' life insurance coverage that did not exist—which was resold for cash to other insurance companies that reinsured the business" (¶ 13).

■ Strangely enough the complaint relies entirely on the theory that Duntov knew of the alleged unlawful practices themselves but fails to allege that, whether he knew of them or not, he was sufficiently alerted inside the corporation during the week preceding the sales of the charges and investigations and the imminence of suspension of trading to make the inside information a factor forbidding the sale by him of his Equity Funding securities. Though Muscara sensed this, as did Hayden, Stone, the pleader failed to state a claim for relief based on these considerations.

Nevertheless, since the facts are before the Court, an amendment of the pleadings to conform will be allowed.

■ I do not now find that Duntov knew of the alleged stock manipulations or the "bogus" policies and the like. That should be stated in fairness to him. It is his position that, although he was one of the six Executive Vice-Presidents, his duties were limited to supervision of the mutual funds, to troubleshooting, and to service on the board of life insurance companies other than the suspected EFLIC. The plaintiff claims

that he "should have known" the facts, but that is not enough. Scienter is still required. S. E. C. v. Manor Nursing Centers Inc., 458 F.2d 1082, 1096, n. 15 (2 Cir. 1972).

■ On the other hand, his mere denial of knowledge from inside sources that there was something seriously amiss is not enough. His knowledge of the Illinois insurance investigation, of the charges by one Dirks of serious fraud which he learned from in-house conversations, his feeling that trading would soon be halted, all add up to make him an "insider" prohibited from dumping his stock, at least *prima facie*. S. E. C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2 Cir. 1968) (en banc), cert. denied sub. nom. Kline v. S. E. C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

The complaint also alleges that the securities sold by Duntov were not, although such securities were required to be, registered pursuant to § 5 of the Securities Act. Duntov counters by noting in an affidavit that the shares were acquired by him pursuant to the exercise of stock options under the 1968 Qualified Stock Option Plan of Equity Funding and were registered under the Securities Act pursuant to Equity Funding's Registration Statement on Form S–1, which was declared effective on May 24, 1972 and was at the time of sale covered by post-effective amendment No. 2 to that Registration Statement dated September 11, 1972.

■ These facts are not contested and there is no doubt that, in form, there was extant an effective registration. But that is only part of the story. Any material infirmity in the prospectus accompanying the Registration Statement affected the marketability of his stock (1933 Act, § 5(b)(2), 15 U.S.C. § 77e). See S. E. C. v. Manor Nursing Centers, Inc., *supra*.

The claim is now that enough has come to light from public sources, the Commission and the Insurance Commissioner, as well as from the filing of a

petition for reorganization under Chapter X of the Bankruptcy Act to make suspect the sufficiency of the prospectus because of material misstatements and omissions. Such material omissions and mistatements would give rise to a claim under § 12 based on a violation of § 5 of the 1933 Act. S. E. C. v. Manor Nursing Centers, Inc., *supra.*

I find then that the plaintiff has standing to sue Duntov under § 12 of the Securities Act and under § 10(b) of the Exchange Act. I find that there is jurisdiction under the *Birnbaum* rule. I find that causation can be established as a matter of law since the broker was harmed by the alleged securities violations. And I find that presumptively on the facts thus far adduced, Duntov was an insider possessed of inside information who was not at liberty to sell his holdings.

Although this is dispositive of the substantive legal points raised, perhaps a word should be said in support of the temporary restraining order which, as it now appears, was based on the status of Jefferies as a self-enforcer of the securities laws who "invited" Hayden, Stone to rescind.

■ An underwriter can certainly rescind an underwriting commitment where the prospectus is found to be materially misleading. Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838 (2 Cir. 1952). "Contracts for securities" was thought to be a concept larger than "underwriting agreements" alone. 195 F.2d at 844, n. 8. The Court noted "that the contract was so closely related to the performance of acts forbidden by law as to be itself illegal." (*Id.* at 844).

■ It should be clear, then, that a broker who finds himself the unwitting agent of a securities violation may similarly cry halt to the transaction. An agent in such circumstances owes no duty to the violator. Indeed, by analogy to the volunteer who rescues a person on a railroad track (Wagner v. International Ry., 232 N.Y. 176, 133 N.E. 437 (1921, Cardozo, J.)), the broker is the volunteer rescuer of unknown investors who would otherwise have bought the stock.

■ If then, as I believe, Jefferies would have been immune from the recovery of damages by Duntov, does the circumstance that it drew the check to Duntov before it knew the facts change the result? In the case of this check, although it was certified in circumstances not shown by the record, it was not passed to a holder in due course (N. Y.U.C.C. § 3–306).[4] There has been no change of position by Duntov based on his *possession of the* check. See American Law Institute, Restatement of Restitution (1937) § 16.[5] See also Restatement of Contracts (1932) § 599, where the comment says: "If the plaintiff is in fact innocent because not aware of the facts which make the transaction illegal, this is enough to enable him to recover from one who has knowledge of the facts, irrespective of misrepresentation." (p. 1112).

■ Where the balance of hardship tips decidedly toward the plaintiff, it is not necessary for preliminary relief that he has demonstrated a likelihood of success but only that he has "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation

---

4. *Cf.* Metropolitan Life Ins. Co. v. Bank of United States, 259 N.Y. 365, 182 N.E. 18 (1932).

5. Restatement of Restitution (1937) § 16 reads:
 "§ 16. Mistaken Belief in Validity of Contract With Payee.
 A person who has paid money to another because of an erroneous belief induced by a mistake of fact that in so doing he is performing a contract with the other which is not subject to avoidance, is entitled to restitution of the amount so paid if the transaction is voidable by either party because of the mistake and is avoided."

and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953); see Semmes Motors Inc. v. Ford Motor Co., 429 F.2d 1197, 1205–06 (2 Cir. 1970).

In this case I think the plaintiff is in even better position. Duntov will have to break through the wall of circumstantial evidence that now surrounds him. He is a top officer of Equity Funding who has, by his own testimony at deposition, been conferring all week with the other top officials and who sells 40,000 shares the day before trading in the stock is stopped. That is not to say that his case should be prejudged. He may be able to convince the trier of fact of the merit of his position. But for the time being the circumstances warrant a preliminary injunction to restrain the cashing of the check if the remedy at law is inadequate.

■ In normal circumstances a court does not rush to enjoin; but when irreparable injury is threatened, it may in its discretion enjoin. (See Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Co., 356 F.Supp. 1066, D.C., 1973; Dino DeLaurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373 (2 Cir. 1966)).

■ Here the evidence indicates that Duntov owns a house with an equity of about $130,000 and that aside from the proceeds of another sale of Equity Funding stock made the same day, which may be challenged, he has about $30,000 in cash. His position like that of other employees of Equity Funding is precarious in view of the Chapter X proceeding, and he has already resigned from the three mutual funds. He is a fair target for derivative and class suits. The plaintiff claims $409,000 in damages for which it drew checks by mistake. In view of my disposition relating to United Bank (see *infra*) the claim against Duntov by the plaintiff will still be $409,000 less the $192,256 held in abeyance until the determination of whether it should be paid to Duntov. In these circumstances, I shall require the plaintiff to post a bond for the full amount of the check in the amount of $192,256.25, and costs, and I shall restrain its collection or payment pendente lite.

## THE CLAIM AGAINST UNITED BANK

The claim against United Bank is different. The complaint against it avers that it participated in the sale of unregistered stock, in the fraudulent manipulation of stock and in the omissions of material facts charged.

The hearing disclosed not one word of proof that United Bank sold any securities. It simply delivered collateral securities to the broker-dealer, North American, named by Duntov. There is no proof that it knew anything about the operations or reports of Equity Funding to whom it was a stranger. Nor is there any proof that it was privy to any inside information or even that it speeded up matters to beat the gun.

United Bank had Chase certify the check made to it as a creditor which had released its collateral. Since the additional shares sold by Duntov from his collateral account could not be delivered against payment on April 2, the settlement date, United Bank arranged to deliver the additional shares and to receive a check which it could certify. I find that, on the evidence, the certification was effected for no ulterior purpose.

■ United Bank was a holder in due course even though it was the payee named, because its consideration was the antecedent debt and the release of its collateral (U.C.C. §§ 3–303(b), 3–302 (2)).

When Chase certified the check for the holder it created a novation in which the drawer was released and Chase substituted as primary debtor (U.C.C. §§ 3–

411(1), 4–403).[6] Under the Negotiable Instruments Law, § 323 the same result followed. See Carnegie Trust Co. v. First National Bank, 213 N.Y. 301, 107 N.E. 693 (1915). There Judge Cardozo noted that even if the drawer had certified the check in the mistaken belief that he had no right of set-off, an action for money paid under mistake would not lie. (*Id.* at 305).

 Jefferies made the check to United Bank in the mistaken belief that it had been credited with the proceeds of the sale. The mistake was not induced by United Bank.

 Aside from the requirements of the Uniform Commercial Code, equity should, for policy reasons, refrain from interfering with the free flow of commerce. The integrity of the certified check is a valuable asset in our economy. An innocent holder should not be disturbed in his rightful possession, though the result may mean a windfall for the customer whose loan has been repaid by the questionable means described. The motion to enjoin the payment of the check to United Bank is denied. The motion to enjoin the payment of the check to Duntov is granted pendente lite and Duntov is directed to return the check to Jefferies upon its posting the bond above mentioned. The bond also shall include indemnification of Chase (N.Y.U.C.C. § 3–603).

The foregoing constitutes findings of fact and conclusions of law under Fed. R.Civ.P. 52(a).

It is so ordered pending settlement of a formal order.

The temporary restraining order is continued to April 20, 1973 at 4 p. m. to permit Jefferies, if so advised, to seek a stay from the Court of Appeals for the Second Circuit.

---

6. The official comment to 4–403 reads:
"5. There is no right to stop payment after certification of a check or other acceptance of a draft, and this is true no matter who procures the certification. See Sections 3–411 and 4–303. The acceptance is the drawee's own engagement to pay, and he is not required to impair his credit by refusing payment for the convenience of the drawer."