CITICORP INTERNATIONAL
TRADING CO., INC.,
Plaintiff,

v.

WESTERN OIL & REFINING COMPA-
NY, INC., Robert A. Zander and Karin
Zander, Defendants and Third–Party
Plaintiffs,

v.

CITICORP INTERNATIONAL TRADING
CO., INC., and Citibank, N.A., Third–
Party Defendants.

No. 88 Civ 5377 (RWS).

United States District Court,
S.D. New York.

April 10, 1992.

As Amended April 22, 1992.

See also 771 F.Supp. 600.

OPINION

SWEET, District Judge.

Plaintiff Citicorp International Trading Company, Inc. ("CITC") by way of this diversity action sought enforcement of a promissory note in the amount of $1,572,-429, dated August 21, 1987 (the "Note"), executed by defendant Western Oil & Refining Company, Inc. ("WORC") and by defendants Robert A. Zander ("Zander") and Karin Zander ("Mrs. Zander") (collectively the "Zanders"). The Zanders counterclaimed and instituted a third-party claim against Citibank, N.A. ("Citibank") under the theory that CITC's corporate veil was pierced. The action was tried before the court, the Zanders appearing *pro se*. On the following findings and conclusions, judgment will be entered granting the relief sought in CITC's complaint and dismissing the Zanders' counterclaim and third-party complaint.

This action is the culmination of the unhappy outcome of a series of anticipated oil transactions in 1987 and 1988 pursuant to which WORC was to purchase oil from the Nigerian National Petroleum Corporation ("NNPC") assisted by CITC, a trading company operated as a division of Citibank, for export from Nigeria to the United States and sale to third parties for anticipated profit. The relationship between CITC and WORC arose out of a Representative Agency Trading Agreement (the "RATA"), under which CITC was to act as WORC's representative agent to assist in WORC's efforts to purchase and sell its oil cargoes. The Note resulted from a certain failed transaction in which CITC incurred shipping and demurrage fees chargeable to the Zanders under the RATA. The subject of this action is the Zanders' liability on the Note as well as their counterclaims against CITC.

This action, filed on August 1, 1988, has had more than its share of pretrial discovery motions, as well as some fourteen substantive or dispositive motions. Judgment was entered in default against WORC on July 23, 1990, for failure to appear by counsel to refile its stricken pleadings.

Milgrim Thomajan & Lee, P.C., New York City, for plaintiff and third-party defendants; William F. Kuntz, II, David P. Langlois, of counsel.

Robert A. Zander and Karin Kirksey Zander, pro se.

The action was tried before the court from January 22, 1992 to January 27, 1992 and was considered fully submitted on March 3, 1992.

## I. *The Facts*

CITC is a corporation organized under the laws of Delaware with its principal place of business at 399 Park Avenue in New York City. At all relevant times, CITC operated as a trading company and as an intermediary in international commercial transactions. It is a wholly-owned subsidiary of Citibank which is operated as a division of Citibank. A number of officers and employees serve both corporations.

Citibank is a national banking association with its principal place of business at 399 Park Avenue in New York City. Citibank was brought into this action as a third-party defendant by the Zanders.

The Zanders are individuals residing at 5301 Old Forge Circle, Raleigh, North Carolina. During all relevant times, the Zanders resided either at the above address or in Phoenix, Arizona and were officers, directors and shareholders of WORC. During relevant times, WORC was organized under the laws of the State of California, with its principal offices located at 400 Tanner Square, 700 East Jefferson, Phoenix, Arizona.

Zander has a degree with honors from Dartmouth College and an MBA degree from Harvard University. He has served as director of public companies and has engaged in a number of business transactions, including the purchase of an oil refinery, real estate and auto dealership transactions.

Mrs. Zander is a Phi Beta Kappa graduate of the University of Southern California and has a law degree from Yale University. Mrs. Zander served as an associate at Choate Hall & Stewart in Boston, as an assistant U.S. Attorney, and as a professor of law.

The Zanders are well-educated, versed in business, and capable of understanding the documents at issue in this litigation.

On December 13, 1985 members of the Congressional Black Caucus wrote to the President of the Republic of Nigeria recommending WORC as the first refinery in the United States owned and operated by Afro–Americans. In 1986, WORC entered into negotiations with the NNPC for the NNPC to supply oil for WORC to export from Nigeria. WORC obtained a "netback" contract with the NNPC dated June 18, 1986, for 50,000 barrels per day, which Zander signed in his capacity as an officer of WORC. However, WORC was unable to obtain letters of credit and/or suitable purchasers for the oil under this contract.

On January 13, 1987, WORC and CITC entered into the RATA, which designated CITC as a marketing representative of WORC with respect to Nigerian Oil. CITC was to assist WORC's efforts to purchase oil cargoes, to promote the sale of WORC's products, and to undertake negotiations with prospective purchasers on behalf of CITC. Section 2.3 of the RATA provided that WORC was to reimburse CITC for shipping or other direct expenses incurred by CITC on behalf of WORC, provided WORC had agreed in writing to the expenditure. CITC agreed not to circumvent the transactions undertaken.

WORC signed a second contract with the NNPC on February 25, 1987, this time for 13,000 barrels of crude oil per day. The second NNPC contract required WORC to make a one million dollar "good faith" performance deposit to validate the contract. WORC borrowed funds in this amount from Citibank, for which Zander executed a personal guarantee and promissory note.

CITC identified Phibro Energy, Inc. ("Phibro Energy"), a subsidiary of Salomon, Inc., as a potential purchaser of WORC's oil. In late April or early May 1987, WORC agreed to sell 1,400,000 barrels of NNPC oil to Phibro Energy, to be delivered on two separate vessels. The NNPC required a letter of credit from WORC, which WORC was unable to obtain. Therefore, WORC requested that Phibro Energy provide two separate letters of credit, one for each vessel.

Phibro Energy opened two letters of credit on May 4, 1987, with WORC as named beneficiary. One, in the sum of approximately $12,560,000 for 700,000 barrels of oil, was a straight transferrable non-negotiable letter of credit, #CCF 5910, issued by Credit Commerciale de France, New York branch ("CCF"). The second letter of credit, in the amount of $12,460,000 for 700,000 barrels of oil, was also straight, transferrable and non-negotiable and was issued by Banque Brussels Lambert, New York branch ("BBL").

Pursuant to written instructions from WORC, Citibank advised each credit into two separate transferred credits naming NNPC as second beneficiary. Under the first subsidiary letter of credit, Citibank advised the amount of $9,360,000 for 500,000 barrels through Nigerian International Bank, Lagos, Nigeria for further advice through Bank of Credit and Commerce International, Lagos. Citibank advised a second subsidiary letter of credit in the amount of $2,125,000 for 200,000 barrels of oil through Citibank (London) for further advice to Trade Development Bank, London.

The division of each of the main credits into two subsidiary credits, and the advisement of each subsidiary credit through multiple banks, resulted in delays in transmission time, often taking a week or ten days.

On May 14, 1987, in advising an amendment from CCF to change the tolerance from "approximately," which implies plus or minus 10% tolerance to the more restrictive 5% tolerance, i.e., "plus or minus 5%," Citibank sent advices containing numerical discrepancies. Instead of reading "amount is now $9,360,000 plus or minus 5%" the advice as originally transmitted stated "amount is now $9,360.00, plus or minus 5%" under one transferred credit and stated "amount is now $2,125.00 plus or minus 5%" rather than $2,125,000 plus or minus 5%" on the other transferred credit. Zander was aware in May of this error. Citibank sent an advice on May 21, 1987 correcting the amount on the first transferred credit to $9,360,000. The second transfer-

red credit was corrected from $2,125.00 to $2,125,000 on June 17, 1987.

Despite numerous amendments, no evidence was submitted to establish that the NNPC requested an amendment or clarification of the dollar amounts specified by the amendments at any time. After Citibank advised the May 14 amendments, the BBL credit was amended nine more times and the CCF credit eleven more times.

On May 14, 1987, at the specific request of Douglas Moses of CITC, Zander, both personally and through his secretary, three times acknowledged in writing WORC's responsibility for shipping costs and demurrage and specifically agreed to reimburse CITC for the cost of chartering vessels to carry the anticipated deliveries of oil which CITC undertook in order to obtain an oil "stem" from NNPC.

On June 9, 1987, WORC's agent, Ronald Shaw, in a handwritten note from Nigeria, requested an extension of the expiration date of the letters of credit. On June 23, 1987, NNPC offered WORC further quantities of oil but did not mention any problems with the letters of credit.

A final amendment under each of the BBL and CCF credits was made on May 29 and advised by Citibank in New York on June 30. The amendments arrived in Nigeria an hour or two after noon, a deadline established by NNPC. At that time, NNPC "gave the oil away" to another purchaser.

No evidence, either documentary or testimonial, was adduced to establish the reasons for the NNPC's failure to load either vessel awaiting at Nigeria. It was suggested that the Nigerians were unhappy with the favorable price received by the Zanders, that the letters of credit opened by Phibro Energy were part of a scam, or that NNPC was upset about the letters of credit.

The Zanders knew that the oil must be shipped from Nigeria by ocean-going vessel and knew that the sale to Phibro Energy required shipping. CITC chartered two vessels on behalf of WORC for this purpose. When the vessels were not loaded in Nigeria, CITC was required to pay on

WORC's behalf ship demurrage and cancellation charges. With respect to the failed venture, CITC eventually incurred and paid shipping and demurrage charges, cancellation charges and interest in a total amount of $1,567,000.

Citibank and CITC initiated an investigation to review the issuance of the letters of credit and determined the nature and extent of the errors and amendments. Their report was produced to the Zanders in response to discovery requests only on the eve of trial.

At the request of Kathi Gilbert, a CITC employee, on July 7, 1987, Zander signed a personal promissory note in the amount of $765,000 and gave a personal guaranty for WORC's indebtedness to CITC.

Alan Weiss ("Weiss"), an executive at Citibank, Edward Kowalcyk ("Kowalcyk"), a vice president and internal counsel at Citibank, and Gerald Horah ("Horah"), a CITC executive, visited the Zanders in Arizona on either one or two occasions at the end of July 1987 and on or about August 20 and 21, 1987. There is no dispute as to the latter occasion.

A promissory note covering the shipping and demurrage charges was proffered to the Zanders containing indemnity and release-of-claims clauses. The Zanders rejected the first documents and thereupon negotiated a simpler promissory note without any such release language. In connection with the proposed release-of-claims clause, Zander inquired as to whether Weiss and Kowalcyk knew anything that the Zanders did not know and received no information that they did.

In the August meeting, the parties negotiated over the exact language of the Note in issue in this action. The Zanders, however, included reference to specific property as additional collateral security for the note. A separate assignment (the "Assignment") was drafted which purported to assign all of the Zanders' interest in a contract with Don and Bea Lee dated June 16, 1987 relating to the property. Both the Note and the Assignment relate to a 20–acre parcel of land located on Bell Road in

Maricopa County, Arizona (hereafter the "Bell Road Property").

At the time they executed the Note, the Zanders remained hopeful that further oil transactions with NNPC could be achieved and that the relationship with CITC would continue. They also sought to protect their previous $1 million loan obtained from Citibank.

According to the testimony of Kowalcyk and Weiss, Kowalcyk received the original Note and kept it in his files until turning it over to counsel. Kowalcyk testified that after the Zanders signed the Note in front of him, Weiss countersigned it, and the Zanders delivered the note to Weiss, who then gave it to Kowalcyk, who kept possession of the Note until he turned it over to his counsel. Midway in the litigation, the Zanders asserted that they had retained the original Note, with the understanding that it would be delivered after an accounting by CITC with respect to the letters of credit, which they alleged to be a condition precedent to the Note. At the time of trial, Weiss and Kowalcyk testified that, as a courtesy, two notes were executed on August 21, 1987.

The two versions of the Note appear identical to the untrained eye. No expert testimony on this subject was offered by the parties. An evaluation of the interests of the witnesses, their testimony and credibility, and the underlying economics of the transaction, compel the finding that CITC obtained the Note on August 21, 1987 and the Zanders' note is either a copy or a duplicate original.

In the summer of 1987, CITC and Citibank lost confidence in the Zanders and ordered a private investigation into their affairs which was completed by early fall. The Zanders possessed no publicly recorded assignable interest in the Bell Road Property on the date of the Note and Assignment. Certified copies of the vesting deeds for the Bell Road Property demonstrate that the Zanders at no time held the Bell Road Property in their own name.

According to Zander, in late October and early November 1987, he learned from Horah, by then an ex-employee of CITC, that

errors had occurred in the letters of credit which had prevented the letters of credit from being accepted by the NNPC. Although an effort was made to subpoena Horah for the trial, he did not appear, and none of the parties sought to compel his attendance.

In a letter of May 27, 1988, from Zander to Mitchell Hedstrom of Citibank, Zander stated:

> as we were induced into signing the Promissory Note by misrepresentation and fraudulent representations by Citibank officials, I again emphasize that under the circumstances, it is neither viewed by either the Zanders or Western as an operative or binding agreement.

On November 17, 1988, Zander, on behalf of WORC, wrote Andrew Hall, President of Phibro Energy and accused Phibro Energy of causing financial damages to WORC in the amount of $62,019,800. According to Zander, "These financial losses and damages are the direct result of Phibro Energy, Inc.'s knowing and deliberate refusal to post an acceptable letter of credit to facilitate the transaction as contemplated in our original agreement." The dispute with Phibro went into arbitration which WORC was unable to pursue.

After the Zanders and WORC defaulted in payment of principal and interest due on the Note, CITC demanded payment of the entire unpaid balance together with all accrued interest. The Zanders have not repaid any of the monies owed under the Note.

The letters of credit all incorporated the Uniform Customs and Practice for Documentary Credits, Publication 400 ("UCP"). Under § 5–102(4) of the Uniform Commercial Code ("UCC"), Article 5 of the UCC does not apply to a letter of credit if by its terms or by agreement the letter of credit is subject in whole or in part to the UCP. Under these credits, CCF and BBL were issuing banks. Citibank (New York) served as an advising bank and Citibank (London), Trade Development Bank (London), Nigerian International Bank (Lagos) and BCCI (Lagos) were second advising banks.

The credits as issued by BBL and CCF were straight, non-negotiable, transferrable letters of credit. Under these credits, only BBL and CCF were paying banks. Requests for payment could only be honored at the counters of CCF and BBL respectively. Citibank was not a paying bank, but the credits permitted transfer at the request of the first beneficiary, WORC.

In the banking industry, large money center commercial banks customarily advise amendments in a turn around time of three to five days. In this case, the turn around time on all amendments advised by Citibank was one or two banking days.

In the event of a mistake or inconsistency, the beneficiary and the applicant share the primary obligation to draw attention to it, although correspondent banks and internal bank review may also reveal inconsistencies. Article 18 of the UCP relates to liability for such inconsistencies.

Under custom and usage in the banking industry, the inconsistencies in the dollar amounts in the amendments as advised by Citibank would not prevent payment to WORC in the amount specified under the main credit. The particular amendment was designed to change the tolerance form plus or minus 10% to plus or minus 5%, not to change the dollar amount. The credits further referred to a unit price. The volume and the unit price were not modified. Furthermore, the main credits remained unaltered and the documents were to be presented at the counters of the issuing banks under the main credits, not at the counters of Citibank. Therefore, the credits would have been honored if the right documents were provided.

## II. *Conclusions of Law*

This is an action between citizens of different states and the amount in controversy exceeds the sum or value of $50,000 exclusive of interest and costs, thereby providing original jurisdiction under 28 U.S.C. § 1332.

### A. CITC Has Established Its Cause of Action

CITC brought this action for judgment upon an instrument for the pay-

ment of money only. Under the UCC, in such an action, "when signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense." N.Y.U.C.C. § 3–307(2) (McKinney's 1991). "[A] promissory note, the document on which the plaintiff's claim is founded, is self-standing. It establishes the plaintiff's right to payment." *Lyons v. Cates Consulting Analysts, Inc.,* 88 A.D.2d 526, 526, 450 N.Y.S.2d 19, 20 (1st Dep't 1982), *aff'd* 64 N.Y.2d 1025, 489 N.Y.S.2d 65, 478 N.E.2d 206 (1985). Proof of a note and a failure to make payment thereon establishes a *prima facie* case for recovery on that note. *Gateway State Bank v. Shangri–La Private Club for Women, Inc.,* 113 A.D.2d 791, 791, 493 N.Y.S.2d 226, 227 (2d Dep't 1985), *aff'd* 67 N.Y.2d 627, 499 N.Y.S.2d 679 (1986); *Citibank, N.A. v. Furlong,* 81 A.D.2d 803, 803, 439 N.Y.S.2d 130, 131 (1st Dep't 1981); *Seaman–Andwall Corp. v. Wright Machine Corp.,* 31 A.D.2d 136, 137, 295 N.Y.S.2d 752, 753 (1st Dept.1968), *aff'd,* 29 N.Y.2d 617, 324 N.Y.S.2d 410, 273 N.E.2d 138 (1971). The maker of a demand note must make payment on its due date or, if no date is stated, on its date of issue. N.Y.U.C.C. § 3–413(1) (McKinney's 1991). As found above, CITC has produced the original, executed Note and has established that the Zanders defaulted on their obligation. Therefore, CITC has established a *prima facie* case and is entitled to recover on the Note unless the Zanders have proved a bona fide defense.

B. The Zanders Did Not Prove their Affirmative Defenses or Counterclaims

Because CITC has established a *prima facie* case, the Zanders bear the burden of proving their affirmative defenses, which consist of the following: (1) that CITC failed to satisfy the condition precedent to delivery of the Note; (2) that the Note was not delivered to CITC; (3) that no consideration passed in connection with the making of the Note; and (4) that CITC fraudulently induced them to sign the Note when it breached its fiduciary duty by concealing its mistakes with respect to the letters of credit. *First City Federal Sav. Bank v. Bhogaonker,* 684 F.Supp. 793 (S.D.N.Y. 1988); *National Westminster Bank v. Barrier Tech. Corp.,* 131 A.D.2d 552, 552, 516 N.Y.S.2d 275, 276 (2d Dep't 1987); *Gateway,* 113 A.D.2d at 791–92, 493 N.Y.S.2d at 227; *Kornfeld v. NRX Technologies, Inc.,* 93 A.D.2d 772, 773, 461 N.Y.S.2d 342, 343 (1st Dep't 1983), *aff'd,* 62 N.Y.2d 686, 476 N.Y.S.2d 523, 465 N.E.2d 30 (1984); *Seaman–Andwall,* 31 A.D.2d at 137–38, 295 N.Y.S.2d at 754. The Zanders also assert fraudulent inducement as a counterclaim against CITC and as a cross-claim against Citibank.

■ New York courts hold sophisticated business people to a stringent standard in assessing defenses to a negotiable instrument. *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985).

### 1. The Zanders Failed to Establish Conditions Precedent

■ The Zanders contend that as condition precedent to delivery of the Note, CITC and Citibank were to provide an accounting with respect to the letters of credit and written warranty of good faith. Under New York law, failure to satisfy conditions precedent is a valid defense to payment of an instrument such as the Note. *See Long Island Trust Co. v. International Inst. for Packaging Educ., Ltd.,* 38 N.Y.2d 493, 496, 381 N.Y.S.2d 445, 447, 344 N.E.2d 377 (1976); N.Y.U.C.C. § 3–306(c) (person taking instrument who does not have rights of holder in due course subject to defenses of, *inter alia,* non-delivery and non-performance of condition precedent). Where terms of conditional delivery have not been complied with, the instrument is unenforceable. *Long Island Trust Co.,* 38 N.Y.2d at 496, 381 N.Y.S.2d at 447, 344 N.E.2d at 379.

Nevertheless, at trial the Zanders did not prove by a preponderance of the evidence that an accounting by CITC and/or Citibank was a condition precedent to delivery

of the Note. Therefore, the Zanders may not avail themselves of this defense.

### 2. *The Note was Delivered*

■ UCC § 3–306(c) also provides a defense to enforcement where the instrument has not been delivered. Generally, possession of an endorsed negotiable instrument imports delivery. *In re Jennings*, 286 A.D. 256, 259, 143 N.Y.S.2d 383, 386 (2d Dep't 1955), *aff'd*, 1 N.Y.2d 762, 152 N.Y.S.2d 305, 135 N.E.2d 56 (1956). As concluded above, CITC produced the original, executed Note. The Zanders not having proved otherwise by a preponderance of the evidence, the court concludes that the Note was delivered to CITC.

### 3. *There was Consideration*

■ UCC § 3–306(c) also provides a defense for failure of consideration. *See also* N.Y.U.C.C. § 3–408 ("Want or failure of consideration is a defense as against any person not having the rights of a holder in due course."). Nevertheless, UCC § 3–408, applicable where the person suing on the instrument does not have the rights of a holder in due course,[1] provides that "no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation *of any kind.*" N.Y.U.C.C. § 3–408 (emphasis added).

Courts in this jurisdiction have consistently held that an antecedent debt constitutes consideration or "value." *See, e.g., Swiss Credit Bank v. Chemical Bank*, 422 F.Supp. 1305, 1311 (S.D.N.Y.1976) (requirement that note be taken "for value" satisfied where promissory notes issued as security for outstanding line of credit, an antecedent claim); *Jefferies & Co. v. Arkus–Duntov*, 357 F.Supp. 1206, 1216 (S.D.N.Y.1973) ("consideration was the antecedent debt"); *see also McCarthy v. Sessions*, 170 A.D.2d 25, 572 N.Y.S.2d 749, 751 (3d Dep't 1991) (plaintiff took note "for value" where it constituted payment for prior farm equipment sales); *Tabor v. Logan*, 114 A.D.2d 894, 495 N.Y.S.2d 67, 68 (2d Dep't 1985) ("antecedent debt constitut-

ed adequate consideration as a matter of law").

As found above, the Zanders executed the Note in the amount $1,572,426 payable to CITC based on pre-existing debts to CITC under the RATA. Indeed, the express language of the Note provides that the Zanders' agreement to pay CITC the $1,572,429 arises "[p]ursuant to the Representative Agency Trade Agreement." Because the Note was therefore taken in consideration of an antecedent debt, the Zanders' claim that the Note is unenforceable due to a lack of consideration fails as a matter of fact and law.

### 4. *There was no Breach of Fiduciary Duty and Any Omission was not Material*

■ As a further defense, and also as a counterclaim and cross-claim, the Zanders have alleged that CITC breached its fiduciary duty arising out of the RATA by failing to advise them of problems with certain letters of credit, and thereby fraudulently induced them to execute the Note.

■ The defense and affirmative claim of fraudulent inducement requires a plaintiff to prove:

(1) a representation (or omission) of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard as to the truth, (4) which was offered to induce [them] to act, and (5) which [they] relied upon to [their] injury.

*Helmsley–Spear, Inc. v. Westdeutsche Landesbank Girozentrale*, 692 F.Supp. 194, 203 (S.D.N.Y.1988) (citing *Jo Ann Homes of Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214 (1969)). The burden of proof for fraud is clear and convincing evidence. *See Helmsley–Spear*, 692 F.Supp. at 203; *Moxie Indus., Inc. v. Hayden*, 677 F.Supp. 187, 192 (S.D.N.Y.1988). The Zanders failed to carry this burden at trial.

The "material facts" allegedly concealed by CITC were the errors in its execution of the documents relating to the letters of credit. While the Zanders may not have

---

1. CITC has not alleged that it is a holder in due course.

known all the details of these difficulties until the eve of trial, they were aware of the overall problem. When he executed the Note, Zander was well-aware of: (1) the delays inherent in the structure created by them; (2) the original problems with the Phibro Energy letters of credit that required numerous amendments; (3) the original transmission errors in numbers and their subsequent correction; and (4) the numerous amendments extending the operative dates of the letters of credit as required by NNPC. Thus, the Zanders did not prove the fraudulent omission or concealment of information unknown to them.

More significantly, however, assuming certain of the details of CITC's performance were not revealed to the Zanders at the time of the execution of the Note, and further assuming that the RATA imposed a fiduciary duty on CITC to inform the Zanders of those details, the Zanders did not establish that these omissions were material. Specifically, they did not show by clear and convincing evidence that the errors in and delay of the letters of credit caused the disintegration of the NNPC transaction and the incurrence of the shipping and demurrage charges by CITC and ultimately by the Zanders under the Note. While it may be a fair inference that such was the case, it is equally likely that the Nigerians reneged for one of the alternative reasons proffered. Thus, the Zanders have not satisfied their evidentiary burden in proving that the representations or omissions, if there were any, were material.

### 5. *The Zanders Failed to Prove Injury*

■ As indicated above, another element of a fraud claim under New York law is injury. *See Posner v. Minnesota Mining & Mfg. Co.*, 697 F.Supp. 122, 123 (E.D.N.Y.1988). The injury must be the " 'direct, immediate, and proximate result of the fraudulent representation.' " *Id.* (quoting *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 307 (2d Cir.); *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986)).

Even assuming that the Zanders had proved a fraudulent misrepresentation or omission, which they have not, they have not proved any such injury. Their claim for damages for emotional distress must be dismissed because "this species of injury is not redressable under a business fraud theory of liability." *Posner*, 697 F.Supp. at 123 (citing *Stich v. Oakdale Dental Center, P.C.*, 120 A.D.2d 794, 795, 501 N.Y.S.2d 529, 531 (3d Dep't 1986)). Actual pecuniary loss is the sole compensable form of damages in a fraud action. *Stich*, 120 A.D.2d at 795, 501 N.Y.S.2d at 531; *Kantor v. Comet Press Books Corp.*, 187 F.Supp. 321, 323 (S.D.N.Y.1960) (damages for loss of profits, physical pain and mental anguish not recoverable in action for fraud in the inducement).

Finally, the Zanders were not injured and can claim no damages from CITC's alleged "wrongful collateralization" of their interest in the Bell Road Property. As Zander admitted, the Zanders did not personally own the property CITC allegedly took as collateral.

### 6. *The Zanders Did not State a Claim for Fraudulent Enforcement of the Note*

■ The Zanders also claim that CITC may not enforce the Note because it is a "knowingly illegal contract" under 12 U.S.C. § 78. That provision of the United States Code provides that:

No officer, director, or employee of any corporation or unincorporated association, no partner nor employee of any partnership, and no individual, primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, or stocks, bonds, or other similar securities, shall serve the same time as an officer, director or employee of any member bank except in limited cases. . . .

The Zanders assert that because CITC and Citibank had some overlapping employees, the Note was an illegal contract under 12 U.S.C. § 78. They further claim that because CITC and Citibank knew of this stat-

ute, their enforcement of the Note is fraudulent.

In the first instance, the Zanders have failed to cite any authority holding that a private right of action exists under 12 U.S.C. § 78. Moreover, the language of the statute nowhere provides that contracts executed by a party in violation are thereby invalid. Finally, the evidence at trial did not establish that CITC is "primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, or stocks, bonds, or other similar securities" and therefore covered by 12 U.S.C. § 78. Therefore, this defense and counterclaim are without merit.

### 7. *The Zanders Proved that CITC's Corporate Veil was Pierced*

■ Because the Zanders failed to prove their defense, counterclaim and third-party claim of fraudulent inducement, their claim for piercing the corporate veil of CITC is technically irrelevant. However, had they prevailed, the evidence at trial established that, with respect to the WORC transactions, CITC's corporate veil was pierced to reach Citibank.

To prove their claim for piercing the corporate veil, it was upon the Zanders to prove that CITC was so dominated by Citibank that it was a "mere instrumentality" of Citibank. *See Fisser v. International Bank,* 282 F.2d 231, 234 (2d Cir.1960); *Fidenas AG v. Honeywell, Inc.,* 501 F.Supp. 1029, 1036 (S.D.N.Y.1980). New York courts have articulated a number of bases for piercing the corporate veil on the instrumentality theory. "A court may pierce the corporate veil to reach the controlling parent, shareholder or director, upon a showing that said party exercised complete domination in respect to the transaction attacked so that the subsidiary has at the time no separate will of its own." *Chase Manhattan Bank v. 264 Water Street Assocs.,* 174 A.D.2d 504, 571 N.Y.S.2d 281, 282 (1st Dep't 1991) (citations omitted). "The corporate veil may be pierced either to achieve equity, where the officers and employees of the parent corporation exercise control over the daily operations of the subsidiary and act as the true prime movers behind the subsidiary's action, or on the theory that the parent conducts business through the subsidiary, which exists solely to serve the parent." *Pritchard Servs., Inc. v. First Winthrop Props., Inc.,* 172 A.D.2d 394, 568 N.Y.S.2d 775, 776 (1st Dep't 1991).

Some factors that may be relevant to this determination are:

> (1) the absence of the formalities which are part and parcel of normal corporate existence, i.e., the issuance of stock, the election of directors, the keeping of corporate records, etc., (2) inadequate capitalization, (3) personal use of corporate funds, and (4) the perpetration of fraud by means of the corporate vehicle.

*Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984). While there is no set rule as to how many of these factors must be present to pierce the corporate veil, generally, courts will pierce the corporate veil when doing so would achieve an equitable result. *Brunswick Corp. v. Waxman,* 599 F.2d 34, 35 (2d Cir.1979). Additional important factors to be considered are "the degree of overlap of personnel, the amount of business discretion displayed by the alleged puppet corporation and whether the two entities deal with each other at arm's length." *United States Barite Corp. v. M.V. Haris,* 534 F.Supp. 328, 330 (S.D.N.Y.1982).

The proof at trial established that Citibank exercised "complete domination in respect to the transaction attacked so that [CITC had] at the time no separate will of its own." *264 Water Street Assocs.,* 174 A.D.2d 504, 571 N.Y.S.2d at 282. Although Weiss was at no time an officer, director or employee of CITC, *Tr.* at 19, he had "management responsibility for the [the WORC] transaction" as Vice President of Citibank; *id.* at 47, directly supervised three CITC employees, including Gerry Horah who was the CITC executive handling the WORC transaction, *id.* at 33; and had "organizational responsibility for a small segment of employees within CITC" which he "managed." *Id.* at 108. Kowalcyk testified that Mr. Horah, in his capacity

at CITC, did not have authority to act on "major decisions" without going through "his boss," Mr. Weiss. Tr. at 112–14. Finally, it was Weiss who signed the Note on behalf of CITC. Tr. at 47 (Weiss testimony that he signed as Vice President of Citibank on behalf of CITC); Pl.Ex. 1, at 3.

The evidence also suggested that Citibank's domination of CITC extended more generally than the WORC transactions. For example, CITC's "mission," according to Weiss, was "to serve the bank [Citibank] by serving companies on international transactions, across border transactions, and around the world transactions." Tr. at 34. CITC and Citibank shared some overlapping officers, *Tr.* at 107, and, possibly, directors. *Id.* at 115. And, although post-dating the WORC transactions, when CITC disbanded as an "operating entity" in 1987, Citibank kept CITC's license "to allow all of the places in the bank that needed to use that license and needed to be empowered by that license—we continued to have that legal vehicle." *Id.* at 20–21. The reason for keeping the CITC license was that "a very specific benefit of having a trading company license was that a bank could not take title to goods in the course of a transactions and a trading company could. That allowed us [Citibank] to create financing transactions for clients in a different manner to suit whatever need they might have had." *Id.* at 21; *id.* at 105 (Kowalcyk testimony that "CITC basically is [and was in 1987] used by a number of Citicorp units around the world for its charter capability that was mentioned earlier, to act in this trade advisory role, and to take possession of title of goods if need be.").

Thus, as the evidence showed, Citibank dominated CITC with respect to the WORC transactions, and more specifically with respect to the execution of the Note. CITC did not have a will of its own, as all major decisions had to be approved by Weiss, a Citibank officer. This same Citibank officer was the "boss" of the CITC employees handling the WORC transactions, had "management responsibility" for those transactions, and signed on behalf of CITC. According to the evidence, CITC appears to have had no purpose separate and distinct from conducting Citibank's international trading business, and seems to have existed "solely to serve the parent." There was an overlap of personnel, officers, and possibly directors. Given these factors and others described above, CITC was a "mere instrumentality" of Citibank, at least as far as the WORC transactions were concerned.

Conclusion

Upon the findings and conclusions set forth above, judgment will be entered granting the relief sought in the complaint with costs upon notice. The counterclaims, affirmative defenses and third-party complaint of the Zanders will be dismissed. Submit judgments on notice.

It is so ordered.